# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

2016 OCT 20  AM 10: 55

```
************************************************************
KATHY DREW-KING, Regional Director of        *
Region 29 of the National Labor Relations Board,   *
for and on behalf of the NATIONAL LABOR       *
RELATIONS BOARD                  *
                         *
            Petitioner    *    -CV-
                         *
      v.                 *   CV 16        5853
                         *
MERIDIAN IMAGING GROUP, LLC d/b/a      *
QUEENS MEDICAL IMAGING/NYU          *     MATSUMOTO, J.
                         *
            Respondent    *
************************************************************
```

REYES, M.J.

## PETITIONER'S INDEX OF EXHIBITS

**Exhibit A(1)** – Charge Against Employer in Case 29-CA-178852 dated June 22, 2016

**Exhibit A(2)** – First Amended Charge Against Employer in Case 29-CA-178852 dated
        September 9, 2016

**Exhibit A(3)** – Charge Against Employer in Case 29-CA-180440 dated July 19, 2016

**Exhibit A(4)** – First Amended Charge Against Employer in Case 29-CA-180440 dated
        September 9, 2016

**Exhibit A(5)** – Charge Against Employer in Case 29-CA-183910 dated September 9, 2016

**Exhibit B(1)** – Order Consolidating Cases, Consolidated Complaint and Notice of Hearing

**Exhibit B(2)** – Order Further Consolidating Cases, Second Consolidated Complaint and Notice
        of Hearing

**Exhibit C** – Answer and Additional Defenses of Respondent Meridian Imaging Group, LLC

**Exhibit D** – Confidential Witness Affidavit of Anthony Randazzo dated July 13, 2016
        (REDACTED)

**Exhibit E** – Confidential Witness Affidavit of Sandra Kucuk dated July 21, 2016 (REDACTED)

**Exhibit F** – Confidential Witness Affidavit of Beriza Luciano dated July 25, 2016
        (REDACTED)

**Exhibit G** – Confidential Witness Affidavit of Carmine Randazzo dated August 2, 2016 (REDACTED)

**Exhibit H** – Confidential Witness Affidavit of Berkis Bordon dated August 2, 2016

**Exhibit I** – Confidential Witness Affidavit of Ivisdenia Cassius-Linval dated August 26, 2016

**Exhibit J** – Confidential Witness Affidavit of Carmine Randazzo dated October 10, 2016

**Exhibit K(1)** – Transcript of "6/17/16 – Noon Meeting Recording"

**Exhibit K(2)** – Audio recording of June 17, 2016 staff meeting

**Exhibit L(1)** – Meridian Imaging Group, LLC Letter to Anthony Randazzo dated June 17, 2016

**Exhibit L(2)** – Meridian Imaging Group, LLC Letter to Anthony Randazzo dated June 20, 2016

**Exhibit M** – Meridian Imaging Group, LLC Letter to Sandra Kucuk dated June 1, 2016

**Exhibit N** – E-mail exchange between Sandra Kucuk ("Sandra Miladinov") and Cheryl Kurman dated June 6 - June 14, 2016

**Exhibit O** – E-mail exchange between Sandra Kucuk ("Sandra Miladinov") and Meridian Imaging Group, LLC officials dated June 8 - July 13, 2016

**Exhibit P** – E-mail exchange between Sandra Kucuk ("Sandra Miladinov") and Cheryl Kurman dated July 12 - July 13, 2016

**Exhibit Q** – Tally of Ballots in National Labor Relations Board Case No. 29-RC-174122

**Exhibit R** – Certification of Representative in National Labor Relations Board Case No. 29-RC-174122

# Exhibit A(1)

FORM EXEMPT UNDER 44 U.S.C 3512

INTERNET
FORM NLRB-501
(2-08)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST EMPLOYER**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case | Date Filed |
| 29-CA-178852 | 6/22/16 |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

## 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| | |
|---|---|
| a.   Name of Employer<br><br>Queens Medical Imaging/NYU | b.  Tel. No.<br>516-222-2022 ext. 1324 |
| | c.  Cell No. |
| d.  Address *(Street, city, state, and ZIP code)*<br><br>69-15 Austin St<br>Forest Hills, NY 11375 | f.  Fax No.<br>516-222-8475 |

| e.  Employer Representative | g.  e-Mail |
|---|---|

d.  Address *(Street, city, state, and ZIP code)*

69-15 Austin St
Forest Hills, NY 11375

e.  Employer Representative

Cheryl Kurman
Director of Human Resources

f.  Fax No.
516-222-8475

g.  e-Mail
Cheryl.kurman@nyumc.org

h.  Number of workers employed
58

| i.  Type of Establishment *(factory, mine, wholesaler, etc.)*<br>Imaging Clinic | j.  Identify principal product or service<br>Health Care |
|---|---|

k. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and *(list subsections)*   (3) and (5)   _____ of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

Since the Union has been certified as the bargaining representative for the Employer's professional and non-professional employees, the Employer has refused to bargain with the Union by unilaterally changing the employees' long-established schedules.

The Employer has also discriminated with regard to the employees' terms and conditions of employment to discourage membership in the Union by indicating in a captive-audience session that the Employer could not hire additional employees or grant wage increases because of the presence of the Union.

The Employer discharged Anthony Randazzo because of his support of and activities on behalf of the Union.

3. Full name of party filing charge *(if labor organization, give full name, including local name and number)*
1199SEIU United Healthcare Workers East

| 4a. Address *(Street and number, city, state, and ZIP code)*<br><br>310 West 43rd Street<br>New York, NY 10036-6407 | 4b. Tel. No.   (212) 582-1890 |
|---|---|
| | 4c. Cell No. |
| | 4d.  Fax No.<br>212-627-8182 |
| | 4e. e-Mail |

5. Full name of national or international labor organization of which it is an affiliate or constituent unit *(to be filled in when charge is filed by a labor organization)*

Service Employees International Union, Change to Win Federation

## 6. DECLARATION

I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.

| By *(signature of representative or person making charge)* | Richard Dorn, Attorney<br>*(Print/type name and title or office, if any)* | Tel. No.<br>212-627-8100 |
|---|---|---|
| | | Office, if any, Cell No. |
| Address  Levy Ratner, P.C., 80 Eighth Avenue Floor 8, New York, NY 10011-5126   6/21/16 *(date)* | | Fax No.<br>212-627-8182 |
| | | e-Mail<br>rdorn@levyratner.com |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**
**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

# Exhibit A(2)

| INTERNET<br>FORM NLRB-501<br>(2-08) | UNITED STATES OF AMERICA<br>NATIONAL LABOR RELATIONS BOARD<br>CHARGE AGAINST EMPLOYER | DO NOT WRITE IN THIS SPACE | |
|---|---|---|---|
| | | Case | Date Filed |
| | | 29-CA-178852 | 9/9/16 |

INSTRUCTIONS:
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

## 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| a. Name of Employer | | b. Tel. No.<br>516-222-2022 ext. 1324 |
|---|---|---|
| Meridian Imaging Group, LLC<br>d/b/a NYU Langone Radiology - Queen's Medical Imaging | | c. Cell No. |
| | | f. Fax No.<br>516-222-8475 |
| d. Address (Street, city, state, and ZIP code) | e. Employer Representative | g. e-Mail |
| 69-15 Austin St<br>Forest Hills, NY 11375 | Alan Winakor, CEO<br>Cheryl Kurman, Director of HR | Cheryl.kurman@nyumc.org<br>h. Number of workers employed<br>58 |
| i. Type of Establishment (factory, mine, wholesaler, etc.)<br>Imaging Clinic | j. Identify principal product or service<br>Health Care | |

k. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and *(list subsections)* **(3) and (5)** of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

    See attached

3. Full name of party filing charge *(if labor organization, give full name, including local name and number)*
    1199SEIU United Healthcare Workers East

| 4a. Address (Street and number, city, state, and ZIP code) | 4b. Tel. No. (212) 582-1890 |
|---|---|
| | 4c. Cell No. |
| 310 West 43rd Street<br>New York, NY 10036-6407 | 4d. Fax No.<br>212-627-8182 |
| | 4e. e-Mail |

5. Full name of national or international labor organization of which it is an affiliate or constituent unit *(to be filled in when charge is filed by a labor organization)*
    Service Employees International Union, Change to Win Federation

6. DECLARATION
I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.

| By _(signature of representative or person making charge)_ | Ceilidh Gao, Attorney<br>_(Print/type name and title or office, if any)_ | Tel. No.<br>212-627-8100 |
|---|---|---|
| | | Office, if any, Cell No. |
| | | Fax No.<br>212-627-8182 |
| Address Levy Ratner, P.C., 80 Eighth Avenue Floor 8, New York, NY 10011-5126   9/9/16<br>_(date)_ | | e-Mail<br>cgao@levyratner.com |

WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)
PRIVACY ACT STATEMENT

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

Meridian Imaging Group, LLC d/b/a NYU Langone Radiology – Queen's Medical Imaging
Attachment to First Amended Charge
29-CA-178852

1. On or about June 17, 2016, in a captive audience meeting, the Employer by CEO Alan Winakor said that the Employer could not grant wage increases to employees in the facility located at 69-15 Austin Street, Forest Hills, NY ("Forest Hills facility"), and could not allow employees in the Forest Hills facility to work in other Employer facilities, because of the presence of the Union, in violation of Section 8(a)(1).

2. The Employer has discriminated with regard to the employees' terms and conditions of employment, and to discourage membership in the Union, by refusing to grant wage increases to employees in the Forest Hills facility, in violation of Section 8(a)(1) and (3).

3. On or about June 17, 2016, the Employer terminated Anthony Randazzo because of his protected concerted activities, and because of his support of and activities on behalf of the Union, in violation of Sections 8(a)(1) and (3).

4. At all material times, the Employer has refused to bargain with the Union by unilaterally changing employees' long-established schedules, in violation of Sections 8(a)(1) and (5).

# Exhibit A(3)

FORM EXEMPT UNDER 44 U.S.C 3512

INTERNET
FORM NLRB-501
(2-08)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST EMPLOYER**

| **DO NOT WRITE IN THIS SPACE** | |
|---|---|
| Case | Date Filed |
| 29-CA-180440 | 7/19/2016 |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

## 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| a. Name of Employer<br><br>Meridian Imaging Group LLC | | **b.** Tel. No.<br>516-222-2022 ext. 1324 |
|---|---|---|
| | | c. Cell No. |
| d. Address *(Street, city, state, and ZIP code)*<br><br>69-15 Austin St<br>Forest Hills, NY 11375 | e. Employer Representative<br><br>Cheryl Kurman<br>Director of Human Resources | f. Fax No.<br>516-222-8475 |
| | | g. e-Mail<br>Cheryl.kurman@nyumc.org |
| | | h. Number of workers employed<br>Approx. 60 |
| i. Type of Establishment *(factory, mine, wholesaler, etc.)*<br>Imaging clinic | j. Identify principal product or service<br>Health care | |

k. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and *(list subsections)*   (3), (5)   of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

On or about July 12, 2016, terminating Sandra Kucuk because of her support of and activities on behalf of the Union.

| 3. Full name of party filing charge *(if labor organization, give full name, including local name and number)*<br>1199SEIU United Healthcare Workers East | | |
|---|---|---|
| 4a. Address *(Street and number, city, state, and ZIP code)*<br><br>310 West 43rd Street<br>New York, NY 10036-6407 | 4b. Tel. No.   (212) 582-1890 | |
| | 4c. Cell No. | |
| | 4d. Fax No. | |
| | 4e. e-Mail | |

5. Full name of national or international labor organization of which it is an affiliate or constituent unit *(to be filled in when charge is filed by a labor organization)*

| 6. DECLARATION<br>I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.<br><br>By _____   Ceilidh Gao, Attorney<br>*(signature of representative or person making charge)*   *(Print/type name and title or office, if any)* | Tel. No.<br>212-627-8100 |
|---|---|
| | Office, if any, Cell No. |
| | Fax No.<br>212-627-8182 |
| Address  Levy Ratner, P.C., 80 Eighth Avenue Floor 8, New York, NY 10011-5126   7/19/16<br>*(date)* | e-Mail<br>cgao@levyratner.com |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**
**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

# Exhibit A(4)

FIRST AMENDED CHARGE **29-CA-180440**

FORM EXEMPT UNDER 44 U.S.C 3512

| INTERNET FORM NLRB-501 (2-08) | UNITED STATES OF AMERICA NATIONAL LABOR RELATIONS BOARD CHARGE AGAINST EMPLOYER | DO NOT WRITE IN THIS SPACE | |
|---|---|---|---|
| | | Case | Date Filed |
| | | 29-CA-180440 | 9/9/16 |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

## 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| a. Name of Employer | | b. Tel. No. |
|---|---|---|
| Meridian Imaging Group, LLC | | 516-222-2022 ext. 1324 |
| d/b/a NYU Langone Radiology - Queen's Medical Imaging | | c. Cell No. |
| | | |
| d. Address (Street, city, state, and ZIP code) | e. Employer Representative | f. Fax No. |
| | | 516-222-8475 |
| 69-15 Austin St | Alan Winakor, CEO | g. e-Mail |
| Forest Hills, NY 11375 | Cheryl Kurman, Director of HR | Cheryl.kurman@nyumc.org |
| | | h. Number of workers employed |
| | | 58 |
| i. Type of Establishment (factory, mine, wholesaler, etc.) | j. Identify principal product or service | |
| Imaging Clinic | Health Care | |

k. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and (list subsections) **(3) and (5)** of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge (set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)

See attached

3. Full name of party filing charge (if labor organization, give full name, including local name and number)
1199SEIU United Healthcare Workers East

| 4a. Address (Street and number, city, state, and ZIP code) | 4b. Tel. No. (212) 582-1890 |
|---|---|
| | 4c. Cell No. |
| 310 West 43rd Street | 4d. Fax No. |
| New York, NY 10036-6407 | 212-627-8182 |
| | 4e. e-Mail |

5. Full name of national or international labor organization of which it is an affiliate or constituent unit (to be filled in when charge is filed by a labor organization)
Service Employees International Union, Change to Win Federation

## 6. DECLARATION

I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.

| By _____ (signature of representative or person making charge) | Ceilidh Gao, Attorney (Print/type name and title or office, if any) | Tel. No. 212-627-8100 |
|---|---|---|
| | | Office, if any, Cell No. |
| | | Fax No. 212-627-8182 |
| Address Levy Ratner, P.C., 80 Eighth Avenue Floor 8, New York, NY 10011-5126 | 9/9/16 (date) | e-Mail cgao@levyratner.com |

WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)

**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

Rcv'd 9/9/16 @ 1217pm

Meridian Imaging Group, LLC d/b/a NYU Langone Radiology – Queen's Medical Imaging
Attachment to First Amended Charge
29-CA-180440

1. On or about July 12, 2016, the Employer terminated Sandra Kucuk because of her
   protected concerted activities, and because of her support of and activities on behalf of
   the Union, in violation of Sections 8(a)(1) and (3).

# Exhibit A(5)

FORM EXEMPT UNDER 44 U.S.C 3512

INTERNET
FORM NLRB-501
(2-08)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
CHARGE AGAINST EMPLOYER

**DO NOT WRITE IN THIS SPACE**

| Case | Date Filed |
|---|---|
| 29-CA-183910 | 09/09/2016 |

INSTRUCTIONS:
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

## 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| | |
|---|---|
| a. Name of Employer<br><br>Meridian Imaging Group, LLC<br>d/b/a NYU Langone Radiology - Queen's Medical Imaging | b. Tel. No.<br>516-222-2022 ext. 1324<br>c. Cell No. |
| d. Address *(Street, city, state, and ZIP code)*<br><br>69-15 Austin St<br>Forest Hills, NY 11375 | e. Employer Representative<br><br>Alan Winakor, CEO<br>Cheryl Kurman, Director of HR | f. Fax No.<br>516-222-8475<br>g. e-Mail<br><br>Cheryl.kurman@nyumc.org<br>h. Number of workers employed<br>58 |

| i. Type of Establishment *(factory, mine, wholesaler, etc.)*<br>Imaging Clinic | j. Identify principal product or service<br>Health Care |
|---|---|

k. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and *(list subsections)* _____ of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

At all times within the last six months, the Employer has maintained an overly broad rule, in violation of Section 8(a)(1), which prohibits "Fighting, horseplay, practical jokes, or other disorderly conduct that could endanger or disturb any employee, contractor, customer, or vendor of or visitor to the company," and "Inappropriately threatening, intimidating, bullying, or coercing any employee, contractor, customer, or vendor of or visitor to your company, in any manner, including by use of abusive or vulgar language."

| 3. Full name of party filing charge *(if labor organization, give full name, including local name and number)*<br>1199SEIU United Healthcare Workers East | |
|---|---|
| 4a. Address *(Street and number, city, state, and ZIP code)*<br><br>310 West 43rd Street<br>New York, NY 10036-6407 | 4b. Tel. No. (212) 582-1890<br>4c. Cell No.<br>4d. Fax No.<br>212-627-8182<br>4e. e-Mail |

5. Full name of national or international labor organization of which it is an affiliate or constituent unit *(to be filled in when charge is filed by a labor organization)*

Service Employees International Union, Change to Win Federation

| 6. DECLARATION<br>I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.<br><br>By _____<br>(signature of representative or person making charge)<br><br>Ceilidh Gao, Attorney<br>(Print/type name and title of office, if any)<br><br>Address Levy Ratner, P.C., 80 Eighth Avenue Floor 8, New York, NY 10011-5126  9/9/16<br>(date) | Tel. No.<br>212-627-8100<br>Office, if any, Cell No.<br><br>Fax No.<br>212-627-8182<br>e-Mail<br>cgao@levyratner.com |
|---|---|

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**
PRIVACY ACT STATEMENT

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

David 9/9/16 @ 12:17pm

# Exhibit B(1)

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 29

MERIDIAN IMAGING GROUP, LLC D/B/A
QUEENS MEDICAL IMAGING/NYU

        **and**                Cases  29-CA-178852;
                                         29-CA-180440

1199SEIU UNITED HEALTHCARE WORKERS
EAST

### ORDER CONSOLIDATING CASES, CONSOLIDATED
### COMPLAINT AND NOTICE OF HEARING

Pursuant to Section 102.33 of the Rules and Regulations of the National Labor Relations Board (the Board) and to avoid unnecessary costs or delay, IT IS ORDERED THAT Case No. 29-CA-178852 and Case No. 29-CA-180440, which are based on charges filed by 1199SEIU United Healthcare Workers East, herein called the Union, against Meridian Imaging Group, LLC d/b/a Queens Medical Imaging/NYU, herein called Respondent, are consolidated.

This Order Consolidating Cases, Consolidated Complaint and Notice of Hearing, which is based on these charges, is issued pursuant to Section 10(b) of the National Labor Relations Act, herein called the Act, 29 U.S.C. § 151 et seq. and Section 102.15 of the Board's Rules and Regulations, and alleges Respondent has violated the Act as described below.

1.    (a)    The charge in Case No. 29-CA-178852 was filed by the Union on June 21, 2016, and a copy was served on Respondent by U.S. Mail on June 23, 2016.

    (b)    The first amended charge in Case No. 29-CA-178852 was filed by the Union on September 9, 2016, and a copy was served on Respondent by U.S. Mail on September 9, 2016.

    (c)    The charge in Case No. 29-CA-180440 was filed by the Union on July 19, 2016, and a copy was served on Respondent by U.S. Mail on July 20, 2016.

1

(d)     The first amended charge in Case No. 29-CA-180440 was filed by the Union on September 9, 2016, and a copy was served on Respondent by U.S. Mail on September 9, 2016.

2.     (a)     At all material times, Respondent has been a limited liability company with an office and place of business in Forest Hills, NY, herein called Respondent's Forest Hills facility, and has been engaged in providing medical imaging and related services.

(b)     During the calendar year ending December 31, 2015, which period is representative of its operations generally, Respondent in conducting its operations described above in paragraph 2(a), derived gross revenues in excess of $250,000.

(c)     During the calendar year ending December 31, 2015, which period is representative of its operations generally, Respondent in conducting its operations described above in paragraph 2(a), purchased and received at its Forest Hills facility goods valued in excess of $5,000 directly from points located outside the State of New York.

(d)     At all material times, Respondent has been an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act, and has been a health care institution within the meaning of Section 2(14) of the Act.

3.     At all material times, the Union has been a labor organization within the meaning of Section 2(5) of the Act.

4.     The following employees of Respondent (the Unit) constitute a unit appropriate for the purposes of collective bargaining within the meaning of Section 9(b) of the Act:

> Included: All regular full-time, part-time and per diem registered nurses, ultra sound technologists, MRI technologists, X-ray technologists, mammogram technologists, radiologic technologists, and CAT scan technologists, schedulers, front desk, medical receptionists, breast coordinators, maintenance, medical records, and liaisons, employed by the Employer at the Employer's Forest Hills facility.
>
> Excluded: All supervisors and guards as defined by the Act.

5.    (a)    On May 6, 2016, in Case No. 29-RC-174122, the Board conducted a representation election among the employees in the Unit.

(b)    On May 20, 2016, the Board certified the Union as the exclusive collective-bargaining representative of the Unit.

6.    At all material times since May 20, 2016, based on Section 9(a) of the Act, the Union has been the exclusive collective bargaining representative of the Unit.

7.    At all material times, the following individuals held the positions set forth opposite their respective names and have been supervisors of Respondent within the meaning of Section 2(11) of the Act and agents of Respondent within the meaning of Section 2(13) of the Act:

| | | |
|---|---|---|
| (a) Alan Winakor | - | Chief Executive Officer |
| (b) Cheryl Kurman | - | Director of Human Resources |
| (c) Dawn Shea | - | Office Administrator |
| (d) Nana Abrokwa | - | Office Administrator |
| (e) Carolyn Cotrreal | - | Scheduling Supervisor |

8.    About June 17, 2016, Respondent, by Alan Winakor, in a staff meeting at Respondent's Forest Hills facility:

(a) Refused to consider employees at the Forest Hills facility for raises because of the presence of the Union;

(b) Refused to allow employees at the Forest Hills facility to work in other Respondent facilities because of the presence of the Union.

(c) Respondent engaged in the conduct set forth above in paragraphs 8(a) and 8(b) because its employees joined the Union and engaged in concerted activities, and to discourage employees from engaging in these activities.

9.    (a)    About June 17, 2016, Respondent's employee Anthony Randazzo engaged in concerted activities with other employees for the purposes of mutual aid and protection, by raising workplace concerns during a staff meeting with Alan Winakor.

(b)    About June 17, 2016, Respondent discharged Anthony Randazzo.

(c)    Since about June 17, 2016, Respondent has refused to reinstate or offer to reinstate Randazzo to his former position of employment.

(d)    Respondent engaged in the conduct described above in paragraphs 9(b) and 9(c) because Anthony Randazzo engaged in the conduct described above in paragraph 9(a) and because Randazzo assisted the Union, and to discourage employees from engaging in these or other concerted activities.

10.    (a)    About July 12, 2016, Respondent discharged its employee Sandra Kucuk.

(b)    Since about July 12, 2016, Respondent has refused to reinstate or offer to reinstate Kucuk to her former position of employment.

(c)    Respondent engaged in the conduct described above in paragraphs 10(a) and 10(b) because Kucuk assisted the Union, and to discourage employees from engaging in these or other concerted activities.

11.    (a)    About June 7, 2016, Respondent changed the work schedule of employee Ivisdenia Cassius-Linval.

(b)    The subject set forth above in paragraph 11(a) relates to wages, hours, and other terms and conditions of employment of the Unit and are mandatory subjects for the purposes of collective bargaining.

(c)     Respondent engaged in the conduct described above in paragraph 11(a) without prior notice to the Union and without affording the Union an opportunity to bargain with Respondent with respect to this conduct and the effects of this conduct.

(d)     As a result of Respondent's conduct described above in paragraphs 11(a) and 11(c), on June 7, 2016, Respondent reduced the weekly work hours of its employee Ivisdenia Cassius-Linval.

12.     By the conduct described above in paragraphs 8 and 9, Respondent has been interfering with, restraining, and coercing employees in the exercise of the rights guaranteed in Section 7 of the Act in violation of Section 8(a)(1) of the Act.

13.     By the conduct described above in paragraphs 8, 9 and 10, Respondent has been discriminating in regard to the hire or tenure or terms or conditions of employment of its employees, thereby discouraging membership in a labor organization in violation of Section 8(a)(1) and (3) of the Act.

14.     By the conduct described above in paragraph11, Respondent has been failing and refusing to bargain collectively and in good faith with the exclusive collective-bargaining representative of its employees in violation of Section 8(a)(1) and (5) of the Act.

15.     The unfair labor practices of Respondent described above affect commerce within the meaning of Section 2(6) and (7) of the Act.

WHEREFORE as part of the remedy for the unfair labor practices alleged above in paragraphs 8 through 14, the General Counsel seeks an Order requiring Respondent to reimburse the discriminatees for reasonable consequential damages incurred by them as a result of the Respondent's unlawful conduct.

FURTHER as part of the remedy for Respondent's unfair labor practices alleged above in paragraphs 8 through 14, the General Counsel seeks an Order requiring Respondent to bargain in good faith with the Union, on request, for the period required by *Mar-Jac Poultry Co.*, 136 NLRB 785 (1962), as the recognized bargaining representative in the appropriate unit.

FURTHER as part of the remedy for the unfair labor practices alleged above in paragraphs 8 through 14, the General Counsel seeks an Order requiring that, at a meeting or meetings scheduled to ensure the widest possible attendance, Respondent's representative Alan Winakor must read the Board-ordered notice to the employees in English and on worktime in the presence of a Board agent. Alternatively, the General Counsel seeks an order requiring that Respondent promptly have a Board agent read the notice to employees during worktime in the presence of Respondent's supervisors and agents identified above in paragraph 6. The General Counsel further seeks all other relief as may be just and proper to remedy the unfair labor practices alleged.

## ANSWER REQUIREMENT

Respondent is notified that, pursuant to Sections 102.20 and 102.21 of the Board's Rules and Regulations, it must file an answer to the consolidated complaint. The answer must be **received by this office on or before September 29, 2016, or postmarked on or before September 28, 2016**. Respondent should file an original and four copies of the answer with this office and serve a copy of the answer on each of the other parties.

An answer may also be filed electronically through the Agency's website. To file electronically, go to www.nlrb.gov, click on **E-File Documents,** enter the NLRB Case Number, and follow the detailed instructions. The responsibility for the receipt and usability of the answer

rests exclusively upon the sender.  Unless notification on the Agency's website informs users that the Agency's E-Filing system is officially determined to be in technical failure because it is unable to receive documents for a continuous period of more than 2 hours after 12:00 noon (Eastern Time) on the due date for filing, a failure to timely file the answer will not be excused on the basis that the transmission could not be accomplished because the Agency's website was off-line or unavailable for some other reason.  The Board's Rules and Regulations require that an answer be signed by counsel or non-attorney representative for represented parties or by the party if not represented.  See Section 102.21.  If the answer being filed electronically is a pdf document containing the required signature, no paper copies of the answer need to be transmitted to the Regional Office.  However, if the electronic version of an answer to a complaint is not a pdf file containing the required signature, then the E-filing rules require that such answer containing the required signature continue to be submitted to the Regional Office by traditional means within three (3) business days after the date of electronic filing.  Service of the answer on each of the other parties must still be accomplished by means allowed under the Board's Rules and Regulations.  The answer may not be filed by facsimile transmission.  If no answer is filed, or if an answer is filed untimely, the Board may find, pursuant to a Motion for Default Judgment, that the allegations in the consolidated complaint are true.

## NOTICE OF HEARING

PLEASE TAKE NOTICE THAT on **Tuesday, November 15, 2016 at 9:30 a.m., at Two MetroTech Center, Fifth Floor Hearing Room, Brooklyn, New York,** and on consecutive days thereafter until concluded, a hearing will be conducted before an administrative law judge of the National Labor Relations Board.  At the hearing, Respondent and any other party to this

7

proceeding have the right to appear and present testimony regarding the allegations in this consolidated complaint.   The procedures to be followed at the hearing are described in the attached Form NLRB-4668.   The procedure to request a postponement of the hearing is described in the attached Form NLRB-4338.

Dated:   September 15, 2016

JAMES G. PAULSEN
REGIONAL DIRECTOR
NATIONAL LABOR RELATIONS BOARD
REGION 29
Two Metro Tech Center
Suite 5100
Brooklyn, NY 11201-3838

Attachments

# Exhibit B(2)

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 29

MERIDIAN IMAGING GROUP, LLC D/B/A
QUEENS MEDICAL IMAGING/NYU

        **and**                         **Cases  29-CA-178852**
                                           **29-CA-180440**
                                         **29-CA-183910**

1199SEIU UNITED HEALTHCARE WORKERS
EAST

## ORDER FURTHER CONSOLIDATING CASES,
## SECOND CONSOLIDATED COMPLAINT
## AND NOTICE OF HEARING

On September 15, 2016, an Order Consolidating Cases, Consolidated Complaint and Notice of Hearing ("Consolidated Complaint") was issued by the Regional Director in Case Nos. 29-CA-178852 and 29-CA-180440, filed by 1199SEIU United Healthcare Workers East ("Union") alleging that Meridian Imaging Group, LLC d/b/a Queens Medical Imaging/NYU ("Respondent") engaged in certain unfair labor practices that violate the National Labor Relations Act ("the Act"), 29 U.S.C. Sec. 151 *et seq.* Pursuant to Section 102.33 of the Rules and Regulations of the National Labor Relations Board ("the Board") and to avoid unnecessary costs or delay, IT IS ORDERED THAT those cases are further consolidated with Case No. 29-CA-183910, filed by the Union.

This Second Consolidated Complaint and Notice of Hearing, issued pursuant to Section 10(b) of the Act and Section 102.15 of the Board's Rules and Regulations, is based on these consolidated cases and alleges that Respondent has violated the Act as described below.

1

1.    (a)    The charge in Case No. 29-CA-178852 was filed by the Union on June 21, 2016, and a copy was served on Respondent by U.S. Mail on June 23, 2016.

      (b)    The first amended charge in Case No. 29-CA-178852 was filed by the Union on September 9, 2016, and a copy was served on Respondent by U.S. Mail on September 9, 2016.

      (c)    The charge in Case No. 29-CA-180440 was filed by the Union on July 19, 2016, and a copy was served on Respondent by U.S. Mail on July 20, 2016.

      (d)    The first amended charge in Case No. 29-CA-180440 was filed by the Union on September 9, 2016, and a copy was served on Respondent by U.S. Mail on September 9, 2016.

      (e)    The charge in Case No. 29-CA-183910 was filed by the Union on September 9, 2016, and a copy was served on Respondent by U.S. Mail on September 9, 2016

2.    (a)    At all material times, Respondent has been a limited liability company with an office and place of business in Forest Hills, NY, herein called Respondent's Forest Hills facility, and has been engaged in providing medical imaging and related services.

      (b)    During the calendar year ending December 31, 2015, which period is representative of its operations generally, Respondent in conducting its operations described above in paragraph 2(a), derived gross revenues in excess of $250,000.

      (c)    During the calendar year ending December 31, 2015, which period is representative of its operations generally, Respondent in conducting its operations described above in paragraph 2(a), purchased and received at its Forest Hills facility goods valued in excess of $5,000 directly from points located outside the State of New York.

      (d)    At all material times, Respondent has been an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act, and has been a health care institution within the meaning of Section 2(14) of the Act.

2

3.      At all material times, the Union has been a labor organization within the meaning of Section 2(5) of the Act.

4.      The following employees of Respondent (the Unit) constitute a unit appropriate for the purposes of collective bargaining within the meaning of Section 9(b) of the Act:

> Included: All regular full-time, part-time and per diem registered nurses, ultra sound technologists, MRI technologists, X-ray technologists, mammogram technologists, radiologic technologists, and CAT scan technologists, schedulers, front desk, medical receptionists, breast coordinators, maintenance, medical records, and liaisons, employed by the Employer at the Employer's Forest Hills facility.
>
> Excluded: All supervisors and guards as defined by the Act.

5.      (a)     On May 6, 2016, in Case No. 29-RC-174122, the Board conducted a representation election among the employees in the Unit.

(b)     On May 20, 2016, the Board certified the Union as the exclusive collective-bargaining representative of the Unit.

6.      At all material times since May 20, 2016, based on Section 9(a) of the Act, the Union has been the exclusive collective bargaining representative of the Unit.

7.      At all material times, the following individuals held the positions set forth opposite their respective names and have been supervisors of Respondent within the meaning of Section 2(11) of the Act and agents of Respondent within the meaning of Section 2(13) of the Act:

        (a) Alan Winakor          -       Chief Executive Officer

        (b) Cheryl Kurman         -       Director of Human Resources

        (c) Dawn Shea             -       Office Administrator

        (d) Nana Abrokwa          -       Office Administrator

        (e) Carolyn Cottreal      -       Scheduling Supervisor

3

8.      About June 17, 2016, Respondent, by Alan Winakor, in a staff meeting at Respondent's Forest Hills facility:

(a) Refused to consider employees at the Forest Hills facility for raises because of the presence of the Union;

(b) Refused to allow employees at the Forest Hills facility to work in other Respondent facilities because of the presence of the Union.

(c) Respondent engaged in the conduct set forth above in paragraphs 8(a) and 8(b) because its employees joined the Union and engaged in concerted activities, and to discourage employees from engaging in these activities.

9.      (a)      About June 17, 2016, Respondent's employee Anthony Randazzo engaged in concerted activities with other employees for the purposes of mutual aid and protection, by raising workplace concerns during a staff meeting with Alan Winakor.

(b)      Since about June 17, 2016, Respondent has maintained the following rule, which prohibits:

> "Fighting, horseplay, practical jokes, or other disorderly conduct that could endanger or disturb any employee, contractor, customer, or vendor of or visitor to the company and inappropriately threatening, intimidating, bullying or coercing any employee, contractor, customer, or vendor of or visitor to your company, in any manner, including by use of abusive or vulgar language."

(c)      Respondent maintained the rule described above in subparagraph 9(b) to discourage its employees from forming, joining, or assisting a union, or engaging in other concerted activities.

(d)      About June 17, 2016, Respondent discharged Anthony Randazzo.

4

(e)     Since about June 17, 2016, Respondent has refused to reinstate or offer to reinstate Randazzo to his former position of employment.

(f)     Respondent engaged in the conduct described above in paragraphs 9(d) and 9(e) because Anthony Randazzo engaged in the conduct described above in paragraph 9(a).

(g)     Respondent engaged in the conduct described above in paragraphs 9(d) and 9(e) because Anthony Randazzo violated the rule described above in paragraph 9(b).

(h)     Respondent engaged in the conduct described above in paragraphs 9(d) and 9(e) because Randazzo assisted the Union, and to discourage employees from engaging in these or other concerted activities.

10.   (a)     About July 12, 2016, Respondent discharged its employee Sandra Kucuk.

(b)     Since about July 12, 2016, Respondent has refused to reinstate or offer to reinstate Kucuk to her former position of employment.

(c)     Respondent engaged in the conduct described above in paragraphs 10(a) and 10(b) because Kucuk assisted the Union, and to discourage employees from engaging in these or other concerted activities.

11.   (a)     About June 7, 2016, Respondent changed the work schedule of employee Ivisdenia Cassius-Linval.

(b)     The subject set forth above in paragraph 11(a) relates to wages, hours, and other terms and conditions of employment of the Unit and are mandatory subjects for the purposes of collective bargaining.

(c)     Respondent engaged in the conduct described above in paragraph 11(a) without prior notice to the Union and without affording the Union an opportunity to bargain with Respondent with respect to this conduct and the effects of this conduct.

(d)    As a result of Respondent's conduct described above in paragraphs 11(a) and 11(c), on June 7, 2016, Respondent reduced the weekly work hours of its employee Ivisdenia Cassius-Linval.

12.    By the conduct described above in paragraphs 8(a) and (b), 9(b), (c), (d), (e), (f) and (g), Respondent has been interfering with, restraining, and coercing employees in the exercise of the rights guaranteed in Section 7 of the Act in violation of Section 8(a)(1) of the Act.

13.    By the conduct described above in paragraphs 8(a), (b) and (c), 9(d), (e) and (h), and 10(a), (b) and (c), Respondent has been discriminating in regard to the hire or tenure or terms or conditions of employment of its employees, thereby discouraging membership in a labor organization in violation of Section 8(a)(1) and (3) of the Act.

14.    By the conduct described above in paragraph 11(a), (c) and (d), Respondent has been failing and refusing to bargain collectively and in good faith with the exclusive collective-bargaining representative of its employees in violation of Section 8(a)(1) and (5) of the Act.

15.    The unfair labor practices of Respondent described above affect commerce within the meaning of Section 2(6) and (7) of the Act.

WHEREFORE as part of the remedy for the unfair labor practices alleged above in paragraphs 8 through 14, the General Counsel seeks an Order requiring Respondent to reimburse the discriminatees for reasonable consequential damages incurred by them as a result of the Respondent's unlawful conduct.

FURTHER as part of the remedy for Respondent's unfair labor practices alleged above in paragraphs 8 through 14, the General Counsel seeks an Order requiring Respondent to bargain in good faith with the Union, on request, for the period required by *Mar-Jac Poultry Co.*, 136 NLRB 785 (1962), as the recognized bargaining representative in the appropriate unit.

FURTHER as part of the remedy for the unfair labor practices alleged above in paragraphs 8 through 14, the General Counsel seeks an Order requiring that, at a meeting or meetings scheduled to ensure the widest possible attendance, Respondent's representative Alan Winakor must read the Board-ordered notice to the employees in English and on worktime in the presence of a Board agent. Alternatively, the General Counsel seeks an order requiring that Respondent promptly have a Board agent read the notice to employees during worktime in the presence of Respondent's supervisors and agents identified above in paragraph 6. The General Counsel further seeks all other relief as may be just and proper to remedy the unfair labor practices alleged.

## **ANSWER REQUIREMENT**

Respondent is notified that, pursuant to Sections 102.20 and 102.21 of the Board's Rules and Regulations, it must file an answer to the consolidated complaint. The answer must be **received by this office on or before October 28, 2016, or postmarked on or before October 27, 2016.** Respondent should file an original and four copies of the answer with this office and serve a copy of the answer on each of the other parties.

An answer may also be filed electronically through the Agency's website. To file electronically, go to www.nlrb.gov, click on **E-File Documents,** enter the NLRB Case Number, and follow the detailed instructions. The responsibility for the receipt and usability of the answer rests exclusively upon the sender. Unless notification on the Agency's website informs users that the Agency's E-Filing system is officially determined to be in technical failure because it is

unable to receive documents for a continuous period of more than 2 hours after 12:00 noon (Eastern Time) on the due date for filing, a failure to timely file the answer will not be excused on the basis that the transmission could not be accomplished because the Agency's website was off-line or unavailable for some other reason. The Board's Rules and Regulations require that an answer be signed by counsel or non-attorney representative for represented parties or by the party if not represented. See Section 102.21. If the answer being filed electronically is a pdf document containing the required signature, no paper copies of the answer need to be transmitted to the Regional Office. However, if the electronic version of an answer to a complaint is not a pdf file containing the required signature, then the E-filing rules require that such answer containing the required signature continue to be submitted to the Regional Office by traditional means within three (3) business days after the date of electronic filing. Service of the answer on each of the other parties must still be accomplished by means allowed under the Board's Rules and Regulations. The answer may not be filed by facsimile transmission. If no answer is filed, or if an answer is filed untimely, the Board may find, pursuant to a Motion for Default Judgment, that the allegations in the consolidated complaint are true.

## NOTICE OF HEARING

PLEASE TAKE NOTICE THAT on **Tuesday, November 15, 2016 at 9:30 a.m., at Two MetroTech Center, Fifth Floor Hearing Room, Brooklyn, New York,** and on consecutive days thereafter until concluded, a hearing will be conducted before an administrative law judge of the National Labor Relations Board. At the hearing, Respondent and any other party to this proceeding have the right to appear and present testimony regarding the allegations in this consolidated complaint. The procedures to be followed at the hearing are described in the

8

attached Form NLRB-4668. The procedure to request a postponement of the hearing is described in the attached Form NLRB-4338.

Dated: October 14, 2016

KATHY DREW KING
REGIONAL DIRECTOR
NATIONAL LABOR RELATIONS BOARD
REGION 29
Two Metro Tech Center
Suite 5100
Brooklyn, NY 11201-3838

Attachments

9

# Exhibit C

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
REGION 29

| | |
|---|---|
| MERIDIAN IMAGING GROUP, LLC D/B/A QUEENS MEDICAL IMAGING/NYU<br><br>**and**<br><br>1199SEIU UNITED HEALTHCARE WORKERS EAST | **Case Nos. 29-CA-178852**<br>**29-CA-180440** |

## ANSWER AND ADDITIONAL DEFENSES OF
## RESPONDENT MERIDIAN IMAGING GROUP, LLC

Pursuant to Sections 102.20 and 102.21 of the Rules and Regulations of the National Labor Relations Board ("NLRB"), Respondent Meridian Imaging Group, LLC D/B/A Queens Medical Imaging/NYU ("Respondent"), hereby files its Answer and Additional Defenses to the September 15, 2016 Complaint and Notice of Hearing ("Complaint") in the above-captioned cases. Unless otherwise noted, the paragraphs in this Answer correspond to the paragraphs of the Complaint.

1.      Respondent responds as follows to the allegations in paragraph 1 of the Complaint:

     (a)    Denied for lack of knowledge, except that Respondent admits it has received a copy of the original charge filed in Case No. 29-CA-178852.

     (b)    Denied for lack of knowledge, except that Respondent admits it has received a copy of the first amended charge filed in Case No. 29-CA-178852.

     (c)    Denied for lack of knowledge, except that Respondent admits it has received a copy of the original charge filed in Case No. 29-CA-180440.

(d)     Denied for lack of knowledge, except that Respondent admits it has received a copy of the first amended charge filed in Case No. 29-CA-180440

2.     Respondent responds as follows to the allegations in paragraph 2 of the Complaint:

(a)     Admitted.

(b)     Admitted.

(c)     Admitted.

(d)     Admitted.

3.     Admitted.

4.     Admitted.

5.     Respondent responds as follows to the allegations in paragraph 5 of the Complaint:

(a)     Admitted.

(b)     Admitted.

6.     Admitted.

7.     Admitted.

8.     Respondent denies the allegations in paragraph 8 of the Complaint, including any and all subparts.

9.     Respondent denies the allegations in paragraph 9 of the Complaint, including any and all subparts, except admits that it discharged Anthony Randazzo (Randazzo) on or about June 17, 2016 and has refused to reinstate or offer to reinstate Randazzo to his former position of employment.

10.     Respondent denies the allegations in paragraph 10 of the Complaint, including any and all subparts, except admits that it discharged Sandra Kucuk on or about July 12, 2016, and further, avers that it has offered to reinstate Kucuk to a vacant position with a higher annual salary than the position from which she was discharged.

11.   Respondent denies the allegations in paragraph 11 of the Complaint, including any and all subparts.

12.   Respondent denies the allegations in paragraph 12 of the Complaint.

13.   Respondent denies the allegations in paragraph 13 of the Complaint, including any and all subparts.

14.   Respondent denies the allegations in paragraph 14 of the Complaint.

15.   Respondent denies the allegations in paragraph 15 of the Complaint.

16.   Without limitation to any specific paragraph in the Complaint, Respondent denies every allegation in the Complaint that is not specifically and expressly admitted herein.

*      *      *      *

<strong><u>FIRST ADDITIONAL DEFENSE</u></strong>

The Complaint fails, in whole or in part, to set forth a claim upon which relief can be granted.

<strong><u>SECOND ADDITIONAL DEFENSE</u></strong>

Randazzo and Kucuk, identified as purported discriminatees in the Complaint, were both disciplined for legitimate, lawful reasons, and not on the basis of any alleged protected activity.

<strong><u>THIRD ADDITIONAL DEFENSE</u></strong>

Respondent maintained the work schedule of Ivisdenia Cassius-Linval for legitimate lawful reasons.

<strong><u>FOURTH ADDITIONAL DEFENSE</u></strong>

Randazzo and Kucuk, identified as purported discriminatees in the Complaint, both would have been disciplined in the absence of any alleged protected activity.

## FIFTH ADDITIONAL DEFENSE

Randazzo lost the protection of the National Labor Relations Act based on his profanity laden outburst towards the Respondent's CEO at a public event attended by many of his co-workers, during which he erroneously accused the Respondent of violating wage hour laws governing when employees are entitled to overtime pay.

## SIXTH ADDITIONAL DEFENSE

The Complaint is too vague to provide Respondent with notice of the allegations against it, and is therefore a violation of Respondent's due process rights.

\*       \*       \*       \*

Respondent reserves the right to add additional defenses.

WHEREFORE, Respondent respectfully requests that the Complaint be dismissed in its entirety, that it be awarded its costs, including attorney fees, pursuant to the Act.

Respectfully submitted,

BAKER HOSTETLER LLP
Paul Rosenberg

Dated: September 28, 2016

Paul Rosenberg /mp

Paul Rosenberg
Baker & Hostetler LLP
45 Rockefeller Plaza, 11th Floor
New York, New York 10111
(212) 589-4299 (telephone)
(212) 589-4201 (facsimile)
prosenberg@bakerlaw.com

609660098.2                              4

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 28 day of September, 2016, a true copy of the foregoing was filed electronically in .pdf format through the National Labor Relations Board's Internet website. Copies were also sent by Federal Express overnight mail to:

James G. Paulsen
Regional Director
National Labor Relations Board
Region 29
Two Metro Tech Center
Suite 5100
Brooklyn, NY 11201-3838
(original and four copies)

Gerard Cadet
1199SEIU United Healthcare Workers East
310 W. 43rd Street
New York, NY 10036

Pamela Jeffrey
Levy Ratner P.C.
80 Eighth Avenue, 8th Floor
New York, NY 10011

_Paul Rosenberg/mp_
Paul Rosenberg

# Exhibit D

Queens Medical Imaging/NYU
Case 29-CA-178852

## Confidential Witness Affidavit

**I, Anthony Randazzo, being first duly sworn upon my oath, state as follows:**

**I have been given assurances by an agent of the National Labor Relations Board (NLRB) that this Confidential Witness Affidavit will be considered a confidential law enforcement record by the NLRB and will not be disclosed unless it becomes necessary to produce this Confidential Witness Affidavit in connection with a formal proceeding.**

I reside at 141-18 79th Avenue, Apt. 2F, Flushing, NY 11367.

My home telephone number (including area code) is 718-380-5363

My cell phone number (including area code) is 917-597-3492

My e-mail address is tonyblaxsox@msn.com

I was employed by Meridian Imaging Group LLC

located at 69-15 Austin Street, Forest Hills, NY 11375.

1.  I was hired by Queens Medical Imaging on or about May 25, 2011.  About a year and a half
    ago, Queens Medical Imaging changed its name to Meridian Imaging Group LLC ("the
    Employer").  Office Manager Kathi Maybaum hired me to work Maintenance.  My brother
    Carmine and I were hired at the same time.  About three to four months ago, Maybaum was
    transferred to another one of the Employer's facilities, and she was replaced by two Office
    Managers: a woman named Dawn (Last Name Unknown), and a man named Nana (LNU).  I
    reported directly to Maybaum while she worked for the Employer, and after she left, I
    reported directly to Dawn and Nana.  I called out sick one time, and I called Maybaum to tell
    her.  My job duties were to maintain the facility, meaning empty garbage cans, sweep the

**Privacy Act Statement**
The NLRB is asking you for the information on this form on the authority of the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq.
The *principal* use of the information is to assist the NLRB in processing representation and/or unfair labor practice cases and related proceedings
or litigation.  The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006).  Additional
information about these uses is available at the NLRB website, www.nlrb.gov.  Providing this information to the NLRB is voluntary.  However, if
you do not provide the information, the NLRB may refuse to continue processing an unfair labor practice or representation case, or may issue you
a subpoena and *seek enforcement of the subpoena in federal court.*

- 1 -                          Initials _____

outdoor grounds, remove snow from the rear sidewalk, and clean bathrooms, hallways, and offices. My work schedule was Monday, Wednesday, Friday from 11:00 AM to 2:30 PM, and Thursday from 11:00 AM to 8:00 PM. I typically worked 18-20 hours per week, and had Tuesday, Saturday and Sunday off. I sometimes worked more hours when the only other Maintenance worker, my brother Carmine Randazzo, took a day off. I got paid $15 per hour. I never worked overtime.

2. Alan Winakor is the Employer's CEO and Owner, both before and after the Employer changed its name from Queens Medical Imaging to Meridian Imaging Group. The first year I worked there, he came to the facility a couple days before Thanksgiving and brought a turkey for the staff. He carved it and served it to the staff. Before the beginning of 2016, Winakor came to the facility only about five times per year (on average). In about January 2016, the Employer began upgrading a lot of its machinery and doing renovations. I believe this is because the Employer became affiliated with NYU. Once this process began, I saw Winakor at the facility about twice per week. I continued seeing him at the facility about twice per week through my termination in June 2016 (described below).

3. Below Winakor, there are a number of supervisors. Two people supervise the Front Desk employees: Aleya and Lajoy. One person, Stella, supervises the back office employees (like Appointment Makers and Medical Records). Howard supervises the Technologists (X-ray, MRI, etc.). Maria supervises the Sonogram Technicians. As mentioned above, Office Managers Nana and Dawn supervise Maintenance and overall the whole facility. The facility provides medical imaging services.

4. In or around April 2016, I walked in on a conversation in the lunch room. There were about four girls in there, including ▮▮▮▮▮▮▮▮▮▮▮▮▮) and ▮▮▮▮▮▮▮▮▮▮▮▮▮

- 2 -                                Initials: _____ *ArL*

███. I don't presently recall who else was in the room. Somebody said something like, did you hear that we're going to vote on a union? I don't recall exactly what was said, or who said it, but that was the first time I heard that a union might be coming in. In the past, I had mentioned to some of the Front Desk girls that a union could help them with some of their complaints, so I was not shocked to hear this. In my previous job (police officer), I was a longtime union member (about twenty years), so I understand the benefits of having a union.

5. On or about April 17 or 24, 2016, I attended a meeting about the union election. The meeting was at the house of ███████████████ There were about twenty employees there, and an Organizer from 1199 SEIU ("the Union") named Baritza. My brother told me about the meeting. The meeting lasted about an hour to an hour and a half. Basically, Baritza spoke to us about what to expect on the day of the union election, which was scheduled for May 6, 2016.

6. During the week leading up the election, the Employer brought in a consultant who tried to persuade the workers to vote against the Union ("the Persuader"). I don't know the man's name, but I know that his name sounded Spanish and he lives in Connecticut. I saw the man meeting with workers in the back office where the election was held. He typically met with five or six people at a time, and Winakor was not in the room during these meetings. The Persuader was at the facility all day, every day, for the five days leading up to the election. I don't have first-hand knowledge of everything he said in these meetings because I only heard bits and pieces of the meetings as I walked past them. I did hear from other people that the Persuader basically gave a talk about why the workers should vote against the Union. (I did

Initials: _____ *An*

attend a meeting with the Persuader and Winakor, described in the next paragraph, but the meetings described in this paragraph are different because Winakor did not attend them.)

7.  On the day before the election, on or about May 5, 2016, Alan Winakor held a meeting in the back office where the election was held.  I heard about the meeting from Stella, who supervises the back office employees, meaning the Appointment Makers and Medical Records.  Stella told me to go to the meeting at about noon.  There were approximately six people in the room: Christine (Sono Tech), Martha (Sono Tech), Ali (Sono Tech), me, Winakor and the Persuader.  For the most part, Winakor did all the talking.  I don't presently recall everything that he said, but basically he said that the Union couldn't benefit the workers, but the workers can vote however they want.  At one point, I asked Winakor, this is your last ditch effort, what are you going to tell me that is going to make me vote against the Union?  I continued, are you going to tell me that from where you're sitting, there is absolutely no benefit to an employer in a Union run shop?  Winakor said, that's right.  I said, if that's the case, I think you know how I'm going to vote, you're not convincing me to vote against the Union.  Winakor said something like, well you have the right to vote any way you want.  I didn't say anything else during the meeting.  I was the only person that asked a question.  None of the other employees spoke up.  Eventually, the meeting ended when Winakor thanked us for our time.  The meeting lasted about twenty minutes.  No one read off any notes during the meeting.  Throughout the day, until about 2:30 PM, Winakor and the Persuader held similar meetings back-to-back with other groups of workers.

8.  On or about May 6, 2016, the union election was conducted in the back office.  The Union won.

Initials: _____

9.  After the election, the Union held about five more meetings at ████████████ 's house.  I attended about four of them.  I believe they occurred on or about May 15 (I did not attend this one), May 22, June 5, June 26, and July 10.  Whereas about 20 employees attended the first Union meeting before the election, by the last meeting, only about 10 employees attended.  Attendance dwindled gradually over time.

10. At one of the Union meetings soon after the election, Baritza said that we would need to select four workers to be on a negotiating committee to bargain with the Employer.  I don't remember the exact date of the meeting.  The workers present at the meeting voted on four people to the negotiating committee: myself, my brother Carmine, Sandra Kouchuk (MRI Tech), and Edwin (Front Desk).  I believe that the Employer learned that I am on the negotiating committee when the Union sent a letter to the Employer in order to schedule a bargaining session.  The bargaining session did not yet occur.  I have not attended any bargaining sessions to date.

11. Winakor and management began enforcing work rules more strictly after the Union campaign.  In or about the week following the election, Winakor called me over to look at something.  He pointed at the tiny tile edging on the wall near the floor and said, "look at that."  There was dust on the edge.  He asked me, "what's that?" I said, "it's dust." I said I would make sure I would get on it.  Before the election, Winakor never made these kind of nitpicky comments about the maintenance work.  With rare exceptions, Winakor never directed me to do any work, nitpicky or otherwise, before the Union campaign.  One day after he had made one of these nitpicky comments to me, Winakor spoke to my brother Carmine.  My brother told me afterwards that Winakor said, "I think your brother hates me."

12. On or about June 17, 2016, the supervisor Stella told me that there was going to be a "town hall" meeting at noon and at 1:00 PM, and I had to go to one of them. I heard from other workers that there was an e-mail notifying us about the meeting, but I don't recall receiving the e-mail. I chose to attend the noon meeting. The meeting took place in an empty storage area (it's in the process of being emptied out so that it can be turned into a new lunch room). I cleaned the room and set up the chairs the morning before the meeting. There were about 25 employees and 5 or 6 management representatives present, including Human Resources. Representative Cheryl Kurman, Office Manager Nana, Office Manager Dawn, Alan Winakor and about two other female managers. There were not enough chairs for everyone, so I and some other people stood throughout the meeting. The meeting began when Winakor gave a speech about how difficult business is, and how he potentially will be losing money due to the Employer's new affiliation with NYU, and the renovations, and the Union coming in. Winakor went on for a long time about how business is bad. He said something to the effect of, I don't know what the Union is promising you, but I'm telling you that I can't live up to those expectations because I can't afford it. After speaking for a while, Winakor took a water break. At that point, Winakor asked if anyone had any questions. One girl asked, why aren't you hiring anyone?, we're swamped on the phones. Winakor said something like, I did hire somebody in the Garden City office, but my hands are tied here because the Union is here. Winakor went on to say something like, I gave raises to other locations but I can't give you raises because the Union is here. An employee named Ali asked why she can no longer work at the Garden City office (she used to split time between Austin Street and Garden City). Winakor said something like, I can't have a Union person in the Garden City office. At one point, an employee (I can't recall who) brought up the issue of being asked to stay

- 6 -                                    Initials: _____ *NM*

past 8:00 PM (we refer to patients who come in when the facility is closing at 8:00 PM, as "add-ons"). Winakor said something like, we have to provide patient care so we have to stay open to take care of these add-ons. Winakor compared the facility to McDonald's and said, if you walked into McDonald's right before it closes, they're going to serve you. My brother Carmine spoke up and said, that's not a good analogy. Winakor said something like, oh really, a janitor, a non-professional, is going to tell me how to run the office? Carmine and Winakor went back and forth a little bit. At that point, I spoke up and said, I don't want to stay past 8:00 PM either. Winakor said something like, oh, so the janitors are the people I have to negotiate with. Winakor and I spoke back forth about the add-ons issue. At one point, I said, what's my reason to stay past 8:00 PM if I'm not getting paid overtime? He and I spoke back and forth about what the law requires with regard to overtime. Eventually, I said, nobody gets overtime because nobody reaches the 40 hour mark in a week. In other unions that I've been involved in, I have gotten paid a premium rate if I stay after my scheduled shift, even if I haven't worked more than 40 hours in the week. I said something like, I don't care for the way you're speaking, you've spoken to me this way before, I'm tired of it, and I'm more of a professional in my life than you are. I said, this is a bunch of bullshit that you got this meeting together but you couldn't get a negotiating meeting scheduled, especially where these types of issues are appropriate to negotiate about. I was upset and raised my voice. Winakor said something like, oh it doesn't have to get to this point. Nana said to me, take it easy, don't get all upset. I said, no I'm all right, and I walked out of the room. I composed myself for a couple minutes and returned to the room. I said, you know what, I deserve to be here, I'm staying. Winakor said, you cursed me. His voice was raised. I said, wait a minute, I never cursed you. I had used the word bullshit to describe a nonsense

situation, but I had not cursed Winakor himself.  Winakor said, things got heated, I'm sorry

things got out of hand, let's just end the meeting because there's another group I have to meet

with.  Winakor said, thanks for your time, enjoy the pizza.  (He had brought pizza in for the

staff to eat.)  That was the end of the meeting.  No one read from any notes during the

meeting.  I worked the rest of my shift and went home.  That was the last shift that I worked

for the Employer.

13. During the meeting on or about June 17, 2016, I wore a purple 1199 wrist band.  Most

employees wore the same wrist band that day.

14. At one point during the meeting on or about June 17, 2016, either right before or right after I

left the meeting and came back, another employee, named Steven Cordoba, walked out of the

meeting while shaking his head.  He quietly mumbled something like, this is nonsense.

Cordoba had been standing in the back of the room.  To my knowledge, Cordoba has not

faced any repercussions for leaving the meeting.

15. Employees regularly swear in the facility while speaking amongst themselves (not to

patients).  I have heard employees use the word "fuck" and the word "bullshit" frequently.

To my knowledge, no employee has ever faced any repercussions for using foul language.

16. On or about June 20, 2016, I received by fedex a letter, dated June 17, 2016, stating that I

was terminated.  A few days later, on or about June 24, 2016, I received another, longer

letter, labeled "revised," stating again that I was terminated.  Prior to being terminated, the

Employer had never disciplined me in any way.  Since being terminated, I have not

communicated with the Employer, except for calling Human Resources to ask about unpaid

accrued vacation time.

Initials: _____

17. Last night, on or about July 13, 2016, I learned that the Employer terminated another member

of the negotiating committee, Sandra Kouchuk.  In addition to myself and my brother, Sandra

was one of the most vocal employees in terms of voicing support for the Union to the

Employer.  My brother was the observer for the Union at the election (but I was not).

18. I understand that some employees have a company e-mail address, but I do not.  I have

received some e-mails from the Employer (specifically from Office Manager Kathy

Maybaum) at my personal e-mail address.

**I am being provided a copy of this Confidential Witness Affidavit for my review.  I
understand that this affidavit is a confidential law enforcement record and should not be
shown to any person other than my attorney or other person representing me in this
proceeding.**

**I have read this Confidential Witness Affidavit consisting of 9 pages, including this page, I
fully understand it, and I state under penalty of perjury that it is true and correct.
However, if after reviewing this affidavit again, I remember anything else that is important
or I wish to make any changes, I will immediately notify the Board agent.**

Date:  July 13, 2016                    Signature:  _____

                                                    Anthony Randazzo

**Signed and sworn to before me on July 13, 2016 at Brooklyn, NY.**

_____
**Brady J. Francisco-FitzMaurice
Board Agent
National Labor Relations Board**

Initials:  _____

# Exhibit E

Queens Medical Imaging/NYU
Case 29-CA-178852

## Confidential Witness Affidavit

**I, Sandra Kucuk, being first duly sworn upon my oath, state as follows:**

**I have been given assurances by an agent of the National Labor Relations Board (NLRB) that this Confidential Witness Affidavit will be considered a confidential law enforcement record by the NLRB and will not be disclosed unless it becomes necessary to produce this Confidential Witness Affidavit in connection with a formal proceeding.**

I reside at 72-19 72nd Place, Glendale, NY 11385

My home telephone number (including area code) is n/a

My cell phone number (including area code) is 917-842-7184

My e-mail address is mmilad5702@yahoo.com

I was employed by Meridian Imaging Group LLC,

located at 69-15 Austin Street, Forest Hills, NY 11375.

1.  I started working at Meridian Imaging Group LLC ("Employer") on or about February 14, 2008.  I interviewed with Chief Technologist Nicole Campensano and MRI Technologist Kirk Williams.  Campensano hired me.  I first worked as Mammography, X-ray and Bone Density Technologist, until I took maternity leave for a period of about three months, beginning on or about February 8, 2009.  During that period, my duties were to perform radiologic and diagnostic imaging on patients.  My supervisor was Campensano; I contacted her when I had to call out sick.  When I returned from maternity leave, I began training as an MRI Technologist.  From that point forward, I performed the same duties as I did before, and in addition, I performed MRIs.  Campensano was still my supervisor.  I continued working as

**Privacy Act Statement**

The NLRB is asking you for the information on this form under the authority of the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the NLRB in processing representation and/or unfair labor practice cases and related proceedings or litigation.  The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006).  Additional information about these uses is available at the NLRB website, www.nlrb.gov.  Providing this information to the NLRB is voluntary.  However, if you do not provide the information, the NLRB may refuse to continue processing an unfair labor practice or representation case, or may issue you a subpoena and seek enforcement of the subpoena in federal court.

Initials _____

an MRI Technologist until February 2016, when I had surgery (described below).  My work schedule was five days per week, for a total of about 35.5 hours: Monday, 7:00 AM to 3:00 PM, and Tuesday through Friday, 7:30 AM to 3:30 PM.  I regularly worked over 35.5 hours, but less than 40 hours per week.  On rare occasions, if the office was short staffed, I worked over 40 hours per week and was paid time and a half. My regular rate of pay was $37 per hour.

2.  When I went on maternity leave in 2009, I worked with Human Resources Representative Marilyn McCarthy to arrange the details.  McCarthy works in the Employer's main office in Garden City.  I spoke to McCarthy over the phone, and e-mailed and faxed paperwork to her at her request.  McCarthy told me that, based on how long I had worked for the Employer at the time, I qualified for 3 months' maternity leave.  I took three months' maternity leave and then returned to work.

3.  The Employer disciplined me one time.  In or about 2013, I scanned a patient with a pacemaker and was suspended for three days without pay.  At that time, I met with Chief Technologist Nicole Campensano, Technical Adviser Jason Durso, Administrator Kathy Maybaum.  In addition, someone participated in the meeting by phone.  I can't presently recall that person's name, but I believe it was a patient care representative from NYU (the Employer is affiliated with NYU).

4.  On or about February 12, 2016, I had surgery and had to take medical leave from work.  The Employer terminated me before I returned to work (described below).  I

5.  In or around February or March 2016, while I was on leave from work, a coworker named ███████████████████████ and I initiated the campaign to become represented by 1199SEIU ("Union").  ██████ and I both called a general phone number for the Union,

- 2 -                                    Initials: _____

which we found on the internet. We both left messages, and then someone from the Union

called ▮▮▮ back. At that point, ▮▮▮ arranged a meeting with the Union. The meeting

took place approximately two weeks after my surgery at a Starbucks in Atlas Mall in Queens,

which I attended. In addition to me and ▮▮▮, ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮, ▮▮▮▮▮▮▮▮▮▮▮, and ▮▮▮▮▮▮▮▮▮

attended the meeting, as well as two Organizers who work for the Union. The Union

Organizers explained that we should find out if our coworkers were interested in the Union,

and if so, we could work towards voting on the Union at an election. In addition, we

discussed issues that employees have with the Employer, including that the Employer keeps

asking employees to do more work without any pay raise, and that the Employer does not

pay employees overtime when employees work beyond their scheduled shift.

6.   After the initial meeting, some employees (including ▮▮▮▮▮ and Carmine Randazzo)

asked employees to sign cards in support of the Union so we could have an election. I never

returned to work after my surgery, so I did not participate in collecting cards. I signed a card

at a Union meeting at ▮▮▮ house.

7.   Since the initial Union meeting at Starbucks in or around February or March 2016, there have

been approximately ten Union meetings. All the meetings were all held at ▮▮▮ house on

Sundays. I attended all of the meetings. Attendance varied from about 10 people to about 40

people. (In total, I think about 50-55 people work for the Employer at the Forest Hills

facility). We held meetings both before and after the election, which occurred on or about

May 6, 2016. Even though I was out on medical leave at the time, I went to the Employer's

facility on the day of the election to vote.

Initials: _____

Case 29-CA-178852                                                        7/21/2016

8.  At one of the Union meetings at [redacted] house, at some point before the election, we voted to
    elect a negotiating committee.  Four people were elected to be on the committee: me,
    Carmine Randazzo (Maintenance), Anthony Randazzo (Maintenance), and Edwin Martinez
    (Front Desk).  I believe that the Employer is aware of who is on the negotiating committee
    because Union Organizer Beriza sent an e-mail to Owner Alan Winakor informing him of the
    committee.

9.  In addition to being on the negotiating committee, I am a member of a Facebook group
    called, "1199 at QMI."  It is a private group for rank-and-file employees at the Forest Hills
    facility and Union representatives.  No one from management can directly access the group
    because no one from management is a member of the group.  I joined the facebook group at
    some point after the initial Union meeting at Starbucks, but before the election on or about
    May 6, 2016.  [redacted] created the group.  The purpose of the group is
    primarily to distribute information to employees in case someone was unable to attend a
    Union meeting.  I have posted in the group about four of five times.  I have posted about: the
    initial bargaining session (in July 2016, described below); how the ballots work (in
    connection with the Union election and the distinction between professional and
    (about a discussion at a Union meeting regarding)
    nonprofessional employees); and I wrote a post encouraging employees to decline extra shifts
    (and how to contact Union representatives (i.e. Beriza, Husson, Girard) regarding grievances, etc)
    unless the Employer agrees to pay overtime.  I am not aware of any supervisor viewing the
    Facebook group or my comments.

10. On or about February 12, 2016, I had surgery and had to take medical leave from work.  In
    the weeks leading up to my surgery, beginning in January 2016, I communicated with
    Human Resources Representative Marilyn McCarthy about taking medical leave.  McCarthy
    and I arranged for medical leave beginning on February 12, 2016, with my return to work

Initials: _____

initially scheduled for May 6, 2016.  In or about April 2016, I learned from my doctor that I would not be ready to return to work as scheduled, so I informed McCarthy by e-mail. McCarthy told me to fill out a form for a Personal Leave of Absence from May 6, 2016 to June 16, 2016.  I did so, and the personal leave was approved.

11. On or about May 26, 2016, I e-mailed McCarthy and told her that I had visited my doctor and he wrote a letter stating that I could return to work on June 17, 2016 on a part-time basis with restrictions (e.g. no bending, lifting more than 5 pounds, or twisting).  I provided the letter to McCarthy.  About the next day, McCarthy replied to me; she asked how long I needed to work part-time.  On or about May 31, 2016, I replied to McCarthy by e-mail; in that e-mail, I included an updated letter from my doctor stating that I needed to work part-time for a period of two months.

12. On or about June 1, 2016, HR Representative Cheryl Kurman e-mailed me a letter, which stated that if I could not return to work full-time without restrictions by June 17, 2016, then I would be terminated.  In the following weeks, Cheryl and I exchanged multiple e-mails, in which I tried to figure out what I needed to do in order to go back to work.  During this time, I obtained another doctor's note, which said that I could return to work beginning on June 17, 2016, with no restrictions, on a part-time basis for a period of two weeks.  I provided this letter to Cheryl.

13. On or about June 16, 2016, I was prepared to return to work the next day.  On the afternoon of June 16, I received an e-mail from Owner Alan Winakor, which stated that he would not allow me to return to work until after my next doctor's appointment.  I replied to Winakor by e-mail, and said that I had been looking forward to returning to work and "had my scrubs

- 5 -                                    Initials: _____

ready to go," but understood his decision.  I told Winakor that my next doctor's appointment was scheduled for July 12.

14. I next saw my doctor on or about July 7, 2016 (I had previously had an appointment scheduled for July 12, but I was able to change it to an earlier date when Winakor asked me to do so).  On or about July 7, I e-mailed Cheryl Kurman and told her that I had gotten permission (and a letter) from my doctor to return to work on July 20, 2016. _(full-time with no restrictions)_ I sent the doctor's letter to Cheryl, but it was not attached, so I re-sent it the following day, on or about July 8.

15. On or about July 12, 2016, Cheryl Kurman sent me an e-mail stating that I was terminated as of that day.  After receiving this e-mail, I exchanged further e-mails with Cheryl on July 13 and 14, in which I tried to understand why I had been fired.

16. Other than me, I am not aware of the Employer terminating any other employee because he or she needed to extend a medical leave.

17. On or about July 19, 2016, I attended the Union's first bargaining session with the Employer.  The meeting took place at the LaGuardia Marriot hotel.  All four employees on the negotiating committee attended, as well as a number of Union representatives and lawyers.  For the Employer, the people present were: a lawyer, Yesenia (LNU; I am not sure what her title is), Cheryl (Human Resources), Maribel (LNU; Technical Adviser) and Dawn (LNU; Forest Hills Administrator) were present.  At the beginning of the meeting, the Union's lawyer said that we want to discuss my termination and Anthony's termination.  The Employer's lawyer said that the issue is not up for discussion.



- 6 -                                  Initials: _____

18. I am aware of a "town hall" meeting that Winakor held at the Employer's Forest Hills facility

in or around mid-June 2016. I did not attend the town hall meeting.

**I am being provided a copy of this Confidential Witness Affidavit for my review. I understand that this affidavit is a confidential law enforcement record and should not be shown to any person other than my attorney or other person representing me in this proceeding.**

**I have read this Confidential Witness Affidavit consisting of 7 pages, including this page, I fully understand it, and I state under penalty of perjury that it is true and correct. However, if after reviewing this affidavit again, I remember anything else that is important or I wish to make any changes, I will immediately notify the Board agent.**

Date: _July 21, 2016_          Signature: _____

                                              Sandra Kucuk

**Signed and sworn to before me on July 21, 2016 at Brooklyn, NY.**

_____

**Brady J. Francisco-FitzMaurice**
**Board Agent**
**National Labor Relations Board**

- 7 -                          Initials: _____

# Exhibit F

Queens Medical Imaging/NYU
Case 29-CA-178852

## Confidential Witness Affidavit

**I, Beriza Luciano, being first duly sworn upon my oath, state as follows:**

**I have been given assurances by an agent of the National Labor Relations Board (NLRB) that this Confidential Witness Affidavit will be considered a confidential law enforcement record by the NLRB and will not be disclosed unless it becomes necessary to produce this Confidential Witness Affidavit in connection with a formal proceeding.**

My office telephone number (including area code) is n/a

My cell phone number (including area code) is 347-880-6634

My e-mail address is beriza.luciano@1199.org

I am employed by 1199SEIU United Healthcare Workers East,

located at 310 W. 43rd Street, New York, NY 10036.

1. I am an Organizer in the New Organizing department of 1199SEIU United Healthcare Workers East ("Union"). I began working as an Organizer for the Union in or around October 2015. I report to Coordinator Hassan Bilal. My duties are to organize new workers who are not currently members. I have been involved with the organizing campaign at Meridian Imaging Group, located at 69-15 Austin Street, Forest Hills, NY ("Employer"), since it began in or around the beginning of March 2016.

2. The Employer's workers have held multiple meetings (approximately six) on Sundays to discuss the Union at a worker's house (except the first meeting, which was held at a Starbuck's). I have attended all the meetings. The meetings were held on or about March 6, March 20, April 3, May 1, June 12, and July 10 (all in 2016).

**Privacy Act Statement**
The NLRB is asking you for the information on this form on the authority of the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the NLRB in processing representation and/or unfair labor practice cases and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). Additional information about these uses is available at the NLRB website, www.nlrb.gov. Providing this information to the NLRB is voluntary. However, if you do not provide the information, the NLRB may refuse to continue processing an unfair labor practice or representation case, or may issue you a subpoena and seek enforcement of the subpoena in federal court.

- 1 -                    Initials _____

3.  At one of the Union meetings, on or about May 1, 2016, the workers elected a negotiating committee to act as temporary shop stewards and to bargain with the Employer. (Once a collective bargaining agreement is in place, the workers will elect a delegate.) The workers who were present nominated individuals, and then there was a show of hands to elect those individuals to the committee. The following workers were elected to the negotiating committee: Anthony Randazzo, Carmine Randazzo, Sandra Kucuk, and Edwin Martinez. In addition, I later informed the Employer that Maria Lizardo is on the negotiating committee ███████████████████████████████

4.  Before the Employer terminated Anthony Randazzo, on or about June 20, 2016, approximately fifteen to twenty people attended the Union meetings. Since Randazzo's termination, fewer workers attend the meetings. For example, at the most recent Union meeting, on or about July 10, 2016, approximately eleven workers attended. Edwin Martinez, who was previously elected to the negotiating committee, didn't show up. He never explained to me why he didn't show up. Other workers told me that Edwin was afraid to attend because he was afraid that the Employer might retaliate against him.

5.  About two weeks before May 23, 2016, I had a phone conversation with the Employer's CEO Alan Winakor. No one else was a part of the conversation. I had called him previously, and he returned my call. The conversation began by me explaining that I was temporarily assigned to this group of workers, and the Union would assign a permanent organizer at some later point in time. I said, in the interim, the negotiating committee of employees can be the point of contact, and I can also be available as needed. I specifically stated that Carmine Randazzo, Sandra Kucuk, Maria Lizardo, Edwin Martinez and Anthony Randazzo are on the negotiating committee. I said that these workers could act as Union

Initials: ___BL___

stewards and handle issues that come up in the workplace.  I explained to Winakor that under

the law, there should be no changes to the working conditions until the Employer and the

Union could come to an agreement.  I explained to him that a worker was having an issue

where she was not allowed to work at the Garden City office (I was referring to ████████

████████████, but I didn't name her at that time) as she had previously done.  Winakor

responded, I don't want these workers to go over and infect the other offices.  I said, if the

other offices want to organize, I don't need workers to go back and forth, I will organize

them, one thing has nothing do to with the other.  I also explained that some workers who

had previously not worked on Saturdays were now being asked to work on Saturdays (I was

referring to ███████████, but I didn't name her at that time).  I said, any changes need to

be discussed in negotiations.  I told Winakor that the Union wanted to work with him on

these issues and have a good working relationship.  Winakor stated that he hadn't dealt with

a Union before, and it was new to him, but he was willing to talk with me.  That was

basically the entire conversation.

6.  On or about May 23, 2016, I sent an e-mail to Winakor to follow up on our conversation.  I

contacted Winakor to address the unilateral changes that the Employer had taken regarding

the schedules and hours of workers, which we had previously discussed by phone.  I wrote

that the Union's position was that these changes were unilateral changes in violation of the

law.

7.  On or about May 26, 2016, I wrote to Winakor again by e-mail.  In this e-mail, I wrote that

the negotiating committee was "more than willing to sit down and resolve" the issues

regarding workers' schedules.  I again informed Winakor that the committee consisted of

Initials: _____

workers Carmine Randazzo, Sandra Kucuk, Maria Lizardo, Edwin Martinez and Anthony Randazzo.

8.  Since the Employer terminated Anthony Randazzo, the workers have been scared. Workers have stated to me directly that they are scared (described below). In addition, a lot of workers have told me what their coworkers are saying. Workers have told me that coworkers are saying things like, maybe we should just leave the Union alone, what have we gotten ourselves into. Overall fewer workers have been contacting me, for example, by calling me on the phone. They are worried that they will be next person to be fired.

9.  For example, on or about July 16, 2016, I had a conversation with Edwin Martinez by phone. He and I spoke alone. I called him because he had said that he would meet with a Board agent (regarding the charge filed by the Union), but then didn't show up to the appointment. I asked Martinez, what happened? He said that his aunt was sick and he had to visit that person. I said that I was sorry to hear that. He said it's okay, she's not that sick. I also explained to Martinez his rights, that he has some protection because he's on the negotiating committee, but sometimes people on the committee can be a target as well. Martinez said, Alan is going to do what he's going to do, he proved that by firing Anthony. I said, we can't guarantee you anything, but you coming forward is going to help the situation. At one point, Martinez stated, I don't know if the Union was a good idea, I'm not even sure if I want to be on the negotiating committee anymore. I did my best to ease his fears, but I get the sense that he is still very afraid of getting fired like Anthony. That was basically the entire conversation.

- 4 -                                   Initials: _____

10. On or about July 14, 2016, a worker named Ivis Cassius-Linval stated to me that she did not want to speak to the labor Board because she was scared of getting fired. Eventually, she agreed to speak to the Board.

11. On or about July 22, I spoke to Maria Lizardo on the phone. She said, I don't think this [meaning the Union] was a good idea. █████████████████████████████ ██████████ now she is very afraid of retaliation.

12. At some point prior to Anthony Randazzo's termination, the workers and I began communicating via a group chat on WhatsApp. The group chat is a big text message thread, and there are approximately 47 workers are on it. I am able to read all the chats. Multiple people stated on the chat that they were afraid they would be fired. One worker is named ████████████████████). █████ stated, "Was this all a bad idea?" Around this time I had also asked workers to speak to the Board Agent about the labor board charge the Union had filed. ████████████ stated that workers were unwilling to testify because "we may become the new target to get fired." █████ wrote, "we're down for the union, but when it comes to our job it's a little concern." I responded that since workers had voted for a union, they won the right to not be terminated unilaterally. ███████████ responded, "But Anthony voted yes and.   Look what still happened." ████████ also wrote, "Being that allen [meaning Alan Winakor] had the power to do what he did to Anthony, I'm pretty sure some of us know and see what's going on recently, and we just do not want to be picked on by management (with write ups and making us uncomfortable at work). Loosing my job is not an option." █████ wrote, "I'm not scared to testify, what I'm afraid of is not being able to pay my bills, buy groceries, pay rent, etc." I called █████ around this time she sent these messages to reassure her. She was very scared of being terminated.

Initials: _____RL_____

13. ███████ also wrote that people were "afraid of what is going to happen for being a

witness" and that "people is concerned because it seems that the union has been moving

slowly in facing our issues.   Write ups, people fired, or loosing their hours.  It is

understandable that some of us feel afraid please put yourself in our shoes."

14. There was also a lot of conversation on the group chat about workers being asked to stay late

past the end of their shifts.  Some workers, including Sandra Kucuk and Carmine Randazzo,

were advocating that workers should not agree to stay later than their shifts because then

during negotiations, management could say that it wasn't a problem.  Other workers stated

that they needed the money and would stay later if they were asked.  Sandra Kucuk wrote

that refusing to stay late would "hit [management] where it hurts most."  A worker named

███████ responded, "There has to be a better game plan, if we hit them where it hurts

which is money then we won't even have a job."

**I am being provided a copy of this Confidential Witness Affidavit for my review.  I
understand that this affidavit is a confidential law enforcement record and should not be
shown to any person other than my attorney or other person representing me in this
proceeding.**

**I have read this Confidential Witness Affidavit consisting of 6 pages, including this page, I
fully understand it, and I state under penalty of perjury that it is true and correct.
However, if after reviewing this affidavit again, I remember anything else that is important
or I wish to make any changes, I will immediately notify the Board agent.**

**Date:**   July 25, 2016                 **Signature:** _____

                                                          Beriza Luciâno

**Signed and sworn to before me on July 25, 2016 at Brooklyn, NY.**


Brady J. Francisco-FitzMaurice
**Board Agent**
**National Labor Relations Board**

Initials: _____

# Exhibit G

Case 29-CA-178852                                                July 27, 2016

Queens Medical Imaging/NYU/Meridian
Imaging Group, LLC
Case 29-CA-178852, 29-CA-180440

## Confidential Witness Affidavit

**I, Carmine Randazzo, being first duly sworn upon my oath, state as follows:**

**I have been given assurances by an agent of the National Labor Relations Board (NLRB) that this Confidential Witness Affidavit will be considered a confidential law enforcement record by the NLRB and will not be disclosed unless it becomes necessary to produce this Confidential Witness Affidavit in connection with a formal proceeding.**

I reside at 150-14 Village Road, Apt. 93GD, Jamaica, NY 11432.

My home telephone number (including area code) is 718-969-5409

My cell phone number (including area code) is 917-796-4493.

My e-mail address is ctroy714@aol.com

I am employed by Queens Medical Imaging, also known as Meridian Imaging Group,

located at 69-15 Austin St, Forest Hills, NY 11375.

1.  I am employed by Queens Medical Imaging, also known as Meridian Imaging Group ("the
    Employer").  I was hired to work in the Maintenance Department (Alan Winakor refers to my
    job title as Janitor) in or about May 2011.  Office Administrator Kathy Maybaum hired me.
    Maybaum is still employed by the Employer, but she now works at a different facility.  Dawn
    Shea has replaced Maybaum as the Office Administrator.  My direct supervisors are Dawn
    Shea and Manager Nana Abreauo.  They both give me work to do.  Shea and Abreauo both
    started working at the facility within the past two months; Maybaum was my direct
    supervisor when she worked at the facility.  Alan Winakor is the Employer's CEO.  My
    duties are to maintain the cleanliness of the office.   My schedule is flexible, but generally
    3:30 PM to close (usually about 8:00 PM to 9:00 PM) on Monday, Wednesday, Friday, and

- 1 -                    Initials: _____

about11:00 AM to close on Tuesday, and about two to four hours on either Saturday or

Sunday.   On average, I work about thirty hours per week in total.  I get paid $15 per hour.

2.   My brother, Anthony Randazzo, and I work together in the Maintenance department.  We

were hired at the same time.  He tends to work in the morning, and I tend to work in the

afternoon, so generally we are not in the facility at the same time.

3.   About three weeks before the election (which occurred on May 6, 2016), I first heard that

employees were interested in being represented by a union.  I was near the copy machine in

the scheduling department in the back office. ███████████████ and ██

████████████ and I were speaking to each other. ████ said, we're looking to form a

union, most people are on board with 1199 SEIU ("the Union"). ████ asked me to help to

make sure everybody is on board.  I said I would talk to people in the office to see if they

were on board.   That was basically the entire conversation.  Over the next about two weeks,

I spoke to almost everyone in the office (at least 30 people; there were some newcomers that

I did not speak to) about the Union.  The majority of people were on board, except a few

people who said they were thinking about it.

4.   During the week of the election, Winakor brought in a man named Juan to speak to workers

about the pros and cons of a union.  Juan was at the facility for three days during the week of

the election, and spoke to employees in small groups.  After some of the workers (including

Front Desk, Scheduling, Medical Records, and Technologist employees) spoke to Juan, they

came to me and said that it sounds like the Union isn't what it is cut out to be.  I explained to

these workers that Winakor hired Juan to persuade workers to vote against the Union.

5.   Just before the election, Winakor held a final round of meetings with small groups of

employees in the new room in the back of the office across from the MRI waiting room.  I

attended one of these meetings with Winakor and a few other employees. During the meeting, Winakor explained all the reasons why the Union is a bad idea, for example, that negotiating a contract will take a long time. Just before that meeting, as Winakor and I were on our way to the meeting room, when we were near the restroom in the hallway next to the water cooler, Winakor and I spoke to each other. There might have been some other people in the area, but I can't recall exactly who. Winakor said to me, Carmine I think your brother hates me. I said, that's a very strong word to use, I don't think my brother hates you, I think it's a misunderstanding. Winakor said, how about we discuss it after the meeting. I said, absolutely. I understood that Winakor was referring to two incidents between Anthony and Winakor, in which Winakor pointed out dust on a tiny ledge in the facility. Anthony had been unhappy with Winakor nitpicking him about the dust because Winakor did not spend much time in the facility before the Union campaign began, and had never paid any attention to Anthony's work before.

6.  Right after the meeting, Winakor and I walked into the back office. We spoke alone. He said, so what's going on? I said, with everything going on, I understand that you're probably feeling annoyed and stressed out, you have to remember that you haven't been here that much and this is the first time your questioning the way the office looks. I didn't mention the Union specifically, but that's what I was referring to when I said "with everything going on." I said, the office is under construction and any time Kathy or anyone has asked me or Anthony do something, it has been done. I said, Anthony is one of the oldest guys here. Winakor laughed and said, I think I've got him there. I said, he's 54. Winakor said, I'm 57. I said, the way you spoke to him, you kind of demoralized him, maybe there is a different way you can speak to him. Winakor said, yeah there is a lot going on, I understand there is a

Case 29-CA-178852                                                        July 27, 2016

lot going on and you two lost it (meaning allowed the facility to get dirtier than usual) because of the construction. I said, after the construction is done we'll make sure the office is always presentable. Then, Winakor got a phone call from his father. After that, we discussed our parents briefly. At some point, I said, listen I'll talk to Anthony, I don't think we'll have any issues going forward. Winakor said, okay. That was the entire conversation.

7. The election took place on or about May 6, 2016. I was the observer for the Union. The Union won.

8. I attended approximately five Union meetings. All the meetings were held at the house of a coworker named ▮▮▮▮▮▮. At least one meeting happened before the election on May 6, 2016, and the rest were after the election. At the meeting before the election, approximately 20-25 employees were present, as well as 1199 representative Bariza. We discussed what it meant to join the Union, what to expect from the Union in the future, and what to expect at the election. In the later meetings, fewer employees attended. At the most recent meeting, only about 12 employees attended.

9. At one of the Union meetings, the workers voted on a negotiating committee. The workers chose myself, Anthony, Edwin and Sandra to be on the committee. The Union informed the Employer that the four of us were on the negotiating committee. Anthony and Sandra have now been terminated.

10. In or about the middle of June 2016, I had a conversation with supervisors Dawn Shea and Nana, in which I informed them that the four employees on the negotiating committee represent the bargaining unit. The week before that conversation, Anthony told me that Dawn Shea asked him to clean the windows, and Anthony told her that we usually don't clean windows, but okay. That Saturday, I cleaned the windows. On Monday, no one said

- 4 -                    Initials: _____

anything to me or to Anthony about the windows. On Tuesday, I went to Nana and said, I'd like to speak to you and Dawn about a couple things. Dawn later came to me and said, I understand you want to speak to me, do you want to talk now? I said, yes. Then, Dawn, Nana and I spoke in Dawn's office. Dawn said, what do you need to speak to us about? I said, obviously ever since we became Union, there have been some petty issues that need to be addressed. I said, for starters, you approached Anthony asking him about windows that were dirty. I cleaned the windows on Saturday, it is now Tuesday, and no one has said anything to either one of us. I said, that being said, my point is everybody here is able to see stuff that is not that important, but when it's corrected, no one makes note of it. Dawn said, yes I was here, I guess I didn't realize it. I said, listen, we don't have a problem doing anything here, but obviously with the Union here it seems that you guys are starting to nitpick at stuff, and it's kind of ridiculous. I said, we have one of our girls in the back who came up to me and stated that they were unhappy about the way you approached her. Dawn said, Michelle, the girl who was on the phone? I said, yes, but I'm not here to discuss the phone issue, that's separate. Nana interrupted and said, are you here looking to speak for her (meaning Michelle)? I said, yes I am, I'm one of the 1199 representatives. Nana said, there is no contract, we were not told by anybody that you are a representative. I said, from my understanding, it was told to Alan (Winakor) that me, Anthony, Sandra and Edwin are representing the office. Nana said, we were not told that, by HIPAA law you can't speak for somebody else and we won't discuss anyone's gripes until we're told otherwise. I said, so you're telling me that you guys are not recognizing 1199? Nana and Dawn both said, that's correct. I said, okay, I'll have the Union's board members (meaning the negotiating committee) notify Alan and let him know that. I said, I understand there is no contract, but

Initials: _____

there should be a working relation between us before the contract is set. Nana said, until we get further notice from Alan, we're not recognizing you. That was the end of the conversation.

11. On or about June 17, 2016, at about noon, I attended a "town hall" meeting in the old medical records office. There was another meeting held at 1:00 PM that I did not attend. CEO Alan Winakor led the meeting. He wasn't holding any notes, but he did have a bunch of pieces of paper from the "suggestion box" that is kept at the front time clock. Winakor spoke for a long time about the merger between Queens Medical Imaging with a radiology office called NRAD and NYU. Eventually, Winakor said, now this brings us to 1199. He said something like, I don't know what 1199 promised you, whatever they promised you it won't be paid by them, it'll be paid by me. He mentioned an 1199 bargaining unit at Mercy Hospital that still has no contract after five years. He said, negotiations between 1199 and Meridian could take a week, a month or years. He said, the Union doesn't want me to do a lot of things, for example, they wouldn't like if I fired somebody, but I can. He said, because 1199 is here, I cannot give you raises until there is a contract. He said, 1199 has a whole bunch of rules that they're claiming I have to abide by, I can't technically do anything until we have a contract. Eventually, Winakor asked if anyone had any questions. Sono Tech Allie asked, if there are supposed to be no changes, why was I moved from one facility to another? Winakor said, the Union does not want you to work at any other facility. Allie basically repeated her question. Winakor said, I don't want you over there because I don't want all my offices influenced by the Union. Allie said, so you're afraid that I'm going to talk to other people about the Union. Winakor said, yes. Winakor said, I've given raises to 90% of the other offices. One employee asked, are we the other 10% that didn't get the

- 6 -                    Initials: _____

Case 29-CA-178852                                                                 July 27, 2016

raise?  Winakor said, I can't because of 1199.  Another employee asked, are you going to

hire more staff in the scheduling department?  Winakor said, if we need more staff then we'll

hire more staff.  The employee said, we're short, the phones went down the other day and we

didn't have enough people to handle the workload.  Dawn said, we are hiring another person,

that person is going to be at the Metropolitan office (in Garden City, Long Island).  The

employee said, we need them here, not there because if the phones go down then that person

is useless to us.

12. At some point, Winakor said, if a patient comes to the office at 7:59, we have a moral

obligation to take that person because that person is sick and we are in the business to help

people.  He spoke about this at length.  Eventually, I said, Alan, people like to go home.

Winakor said, well you don't have a license to make that determination.  I said, if the office

closes at 8:00, why are we taking people at this time, because everybody's staying a half hour

to an hour later.  Winakor said, well if the janitorial personnel needs to leave, then they can

leave, and I will get a janitorial service in here to finish what they need to do.  I said, again

it's not about the janitorial people not wanting to stay, it's everybody here.  Winakor said,

again you don't have a license.  I said, this license stuff is nonsense, I've stayed plenty of

times, everybody here doesn't mind helping out, you're missing the point, this is something

that needs to be discussed with 1199.  Winakor said, does anyone other than the janitorial

staff have a problem with the way I'm running my office?  At that point, Anthony said, Alan,

enough with the janitorial business, that's not what this meeting is about, if you wanted to

discuss these issues, you seem to have time to have this meeting, make appropriate time with

1199 so we can have this discussion.  Winakor said, what is your position in here?  Anthony

said, Maintenance.  Winakor said something emphasizing that Anthony is a janitor.  Anthony

- 7 -                          Initials: _____

Case 29-CA-178852                                               July 27, 2016

said, this is the second time you're trying to put me down, I'm more professional than you'll ever be, I'm not going to take it anymore, stop the bullshit. Then, Nana said to Anthony, calm down. Anthony walked out of the meeting and said, enough of this bullshit. Winakor said, well I wasn't expecting this. After a couple minutes, Anthony came back in and said, I have a right to be here. Winakor said, yeah you're real professional telling me to go fuck myself. Anthony said, I never told you to go fuck yourself, I never said those words. I said, relax, relax. Anthony stayed in the room but didn't say anything more. Winakor continued with the meeting for about another five or six minutes.

13. Since the Union election, multiple employees have been disciplined, and my brother Anthony was terminated. Multiple employees told me that they felt that they were being harassed because they voted in the Union, and now feel that neither the Union nor the government can protect them. In particular, many people feel that Anthony was fired for no good reason and that the Union can't protect him. Especially since Anthony's termination, employees are afraid that the Employer is trying to fire them because they voted in the Union. Another example of workers feeling harassed is ███████████████████████████ ███████. Before the Union election, ████ working 2 days per week in the Forest Hills facility and 2 days per week in the Garden City facility. After the Union was voted in, the Employer will not allow her to work in Garden City at all. ████ told me that the Employer told her that she might have to work on Saturday in order to keep working 4 days per week. Another example is a ██████ named ████ She was written up for an error that she supposedly made. She told me that she felt she didn't violate the scheduling procedure, and that the Employer is only picking on her because the workers voted in the Union. Another example is ██████████████████ ████████ told me that she was written up twice

- 8 -                    Initials: _____

Case 29-CA-178852                                                July 27, 2016

after the Union election, for doing a procedure that she had been asked to do even though she

hadn't been trained properly to do it.  Another example is ████████████████ ▪

Radiology Supervisor Howard gave ████ a verbal warning about a mistake that ████

supposedly made using a machine that she was asked to use even though she was not familiar

with it.  All these employees told me that they feel the Employer has been nitpicking them,

and fear termination, because the workers voted in the Union.

14. Because the workers feel harassed by the Employer, they are afraid that the Employer will

retaliate against them if they express support for the Union or speak to agents of the NLRB.

I asked a number of employees to speak to the NLRB about this charge.  About six people

said that they didn't want to do so because they were afraid of retaliation ████████████

████████████████████████████████████████████████

████████████████████████████ ▪

**I am being provided a copy of this Confidential Witness Affidavit for my review.  I understand that this affidavit is a confidential law enforcement record and should not be shown to any person other than my attorney or other person representing me in this proceeding.**

**I have read this Confidential Witness Affidavit consisting of 9 pages, including this page, I fully understand it, and I state under penalty of perjury that it is true and correct. However, if after reviewing this affidavit again, I remember anything else that is important or I wish to make any changes, I will immediately notify the Board agent.**

Date: _____8/2/16_____     Signature: _____

                                                         Carmine Randazzo

Signed and sworn to before me by telephone on ___8/2/16_____

_Brady J. Francisco-FitzMaurice_

**Brady J. Francisco-FitzMaurice**
**Board Agent**
**National Labor Relations Board**

Initials: ___cal___

July 27, 2016

BROOKLYN, NY

2016 AUG -5  PM 1:57

- 10 -        Initials: _____

# Exhibit H

Queens Medical Imaging/NYU/Meridian
Imaging Group, LLC
Case 29-CA-178852; 29-CA-180440

## Confidential Witness Affidavit

**I, Berkis Bordon, being first duly sworn upon my oath, state as follows:**

**I have been given assurances by an agent of the National Labor Relations Board (NLRB) that this Confidential Witness Affidavit will be considered a confidential law enforcement record by the NLRB and will not be disclosed unless it becomes necessary to produce this Confidential Witness Affidavit in connection with a formal proceeding.**

I reside at 87-03 80th Street, Woodhaven, NY 11421.

My home telephone number (including area code) is n/a

My cell phone number (including area code) is 347-479-0608.

My e-mail address is beckyborden71@yahoo.com

I am employed by Queens Medical Imaging, also known as Meridian Imaging Group

located at 69-15 Austin St, Forest Hills, NY 11375.

1. I am employed by Queens Medical Imaging, also known as Meridian Imaging Group ("the

   Employer"). I was most recently hired on or about July 29, 2015. Office Administrator

   Kathy Maybaum hired me. (I also worked for the Employer previously, for a period of about

   three years, about seven years ago.) I am a Scheduler. My duties are to schedule

   appointments for patients in the Forest Hills facility and the Garden City facility (224 7th

   Street, Garden City, NY). I only work in the Forest Hills facility. My supervisor is named

   *Kalendarev BB.*

   Stella (last name unknown). Stella supervises scheduling and medical records employees. If

   I have to call in sick, I have to contact any supervisor early in the morning, Morning

**Privacy Act Statement**

The NLRB is asking you for the information on this form on the authority of the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the NLRB in processing representation and/or unfair labor practice cases and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). Additional information about these uses is available at the NLRB website, www.nlrb.gov. Providing this information to the NLRB is voluntary. However, if you do not provide the information, the NLRB may refuse to continue processing an unfair labor practice or representation case, or may issue you a subpoena and seek enforcement of the subpoena in federal court.

- 1 -                                         Initials *BB.*

Cases 29-CA-178852. 29-CA-180440                                    July 27, 2016

*Eileen Collado* BB      *Caldwell* BB

Supervisor ~~Aliya~~ or Evening Supervisor Lajoy, or Office Administrator Dawn (Dawn *Shea* BB

replaced Kathy Maybaum).

2. On or about June *17*, 2016, I attended a "town meeting" at the Forest Hills facility for the
   entire office. I received an e-mail from a member of the administrative staff (I don't recall
   specifically who sent the e-mail) stating that there would be two meetings, one from noon to
   1:00 PM and another from 1:00 PM to 2:00 PM, and that all employees would attend one of
   the meetings. I was assigned to attend the earlier meeting, from 12:00 to 1:00 PM, with the
   rest of the morning staff (the evening staff attended the later meeting). There were
   approximately 22 employees at the meeting. The meeting took place in the old medical
   records department, which was being cleared out so that a new cafeteria could be built in that
   space. Lunch was provided so that we could attend the meeting during lunch. I made an
   audio recording of the meeting using my cell phone, which I have provided to the NLRB.
   The male voice in the recording that speaks more than anyone else is the voice of Alan
   Winakor. Alan Winakor is the Owner of the facility that I work in. He owns more than just
   one facility; I believe he also owns the Garden City facility and another medical imaging
   facility in Manhattan.

3. Anthony Randazzo (Janitor) attended the meeting described above. During the meeting, I
   observed Anthony Randazzo and Winakor speak to each other. Randazzo stood near the wall
   on my right side, and Winakor sat directly across from me. At one point, Winakor asked if
   anyone had questions. Randazzo asked a question about workers staying after their
   scheduled shift on Mondays. Technicians and Front Desk staff are asked to stay at work
   after their scheduled shift when a patient arrives near the end of the dya. Winakor and
   Randazzo went back and forth about this issue. Eventually, Winakor asked if some

- 2 -                                     Initials: *B.B.*

employee other than a Janitor had any questions. Even though Randazzo is a Janitor, he was

speaking on behalf of other employees who are asked to stay after their shift. When Winakor

asked for questions from certified professionals, and not from Janitors, Randazzo got upset

and raised his voice. At that point, Randazzo said something like, Alan stop with the

custodial department bullshit, you are being a wise guy. Winakor asked, what is your job

description Anthony? Randazzo said, Custodial, but you say I'm not a professional. At one

point, either before or after this exchange, Randazzo walked out of the meeting. Randazzo

came back into the meeting after a few seconds.

4. I am aware that the Employer terminated Randazzo after the above-described meeting,

purportedly because Randazzo disrupted the meeting. The meeting took place on a Friday,

and everyone in the office was talking about it the following Monday.

5. I am aware that the Union has held meetings on Sundays, but I have not attended any because

I am busy on those days as a Sunday school teacher.

6. Employees commonly use foul language in the facility (but not in front of patients).

Sometimes a supervisor will ask an employee to calm down if they hear an employee use

foul language, but I don't know of any employee being disciplined, suspended or terminated

for this reason.

**I am being provided a copy of this Confidential Witness Affidavit for my review. I
understand that this affidavit is a confidential law enforcement record and should not be
shown to any person other than my attorney or other person representing me in this
proceeding.**

**I have read this Confidential Witness Affidavit consisting of 3 pages, including this page, I
fully understand it, and I state under penalty of perjury that it is true and correct.
However, if after reviewing this affidavit again, I remember anything else that is important
or I wish to make any changes, I will immediately notify the Board agent.**

Date:   8·2 2016.          Signature: _Berkis Bordon_
                                        (Berkis Bordon)

                            3 -              Initials: _B.B._

Signed and sworn to before me by telephone on ___8_/2_/16_____

**Brady J. Francisco-FitzMaurice**
**Board Agent**
**National Labor Relations Board**

- 4 -

Initials: ___B.B._____

# Exhibit I

Case 29-CA-178852                                                    July 27, 2016

Queens Medical Imaging/NYU/Meridian
Imaging Group, LLC
Case 29-CA-178852, 29-CA-180440

## Confidential Witness Affidavit

**I, Ivisdenia Cassius-Linval, being first duly sworn upon my oath, state as follows:**

**I have been given assurances by an agent of the National Labor Relations Board (NLRB) that this Confidential Witness Affidavit will be considered a confidential law enforcement record by the NLRB and will not be disclosed unless it becomes necessary to produce this Confidential Witness Affidavit in connection with a formal proceeding.**

I reside at 175-39 Dalny Road, Apt. 6D, Jamaica, NY 11432.

My home telephone number (including area code) is n/a.

My cell phone number (including area code) is 917-575-3585.

My e-mail address is ivisdenia.cassius@gmail.com

I am employed by Queens Medical Imaging, also known as Meridian Imaging Group

located at 69-15 Austin St, Forest Hills, NY 11375.

1. I am employed by Queens Medical Imaging, also known as Meridian Imaging Group ("the
   Employer"). I was hired on or about July 6, 2010. Office Administrator Kathy Maybaum
   hired me. From about September 11, 2015 through about December 14, 2015, I did not work
   due to maternity leave. I have always worked at the Front Desk. When I was hired, my direct
   supervisor was Inga Milleron (Front Desk Supervisor), until about November 2013. During
   that time, I was a regular Front Desk employee. As a Front Desk employee, my duties were
   to do general scheduling and checking in patients and completing paperwork. In November
   2013, Milleron became regular Front Desk staff, and I became Front Desk Supervisor until I
   went on maternity leave. During that time I reported directly to Kathy Maybaum. As Front
   Desk Supervisor, my additional duties were to speak to patients when problems arose and to
   run statistical reports to show how many missed appointments happened and to show

- 1 -                        Initials: _____

whether staff were scanning patient's palm prints. The Front Desk Supervisor does not have authority to hire or fire employees. However, when I was Front Desk Supervisor, I asked employees questions during interviews and recommended that some employees be hired; my recommendations were adopted my Kathy Maybaum. I never recommended that anyone be fired. As Front Desk Supervisor, I did write up employees for not following protocol, paperwork errors, coming in late, etc. Those disciplines went in employees' files. When I returned from maternity leave on or about December 14, 2015, I went back to being a regular Front Desk employee. I also performed Breast Coordinator duties, meaning scheduling mammograms, and calling mammogram patients to schedule follow-up appointments, etc. At that time, Eileah Collado (AM Front Desk Supervisor) and Lajoy Cadwell (PM Front Desk Supervisor) were the Front Desk Supervisors.

2. The Front Desk Supervisor(s) generally set the schedules for Front Desk staff, but during 2016, when I had to ask that my work schedule be changed to accommodate my school schedule, I asked Office Administrator Kathy Maybaum and Director of Operations Yesenia Negrón because the Front Desk was in disarray.

3. On or about January 8, 2016, I became a part-time employee so that I could attend nursing school full-time. In the weeks leading up to that date, I e-mailed Office Administrator Kathy Maybaum to ask that my school schedule by accommodated. As a result, the Employer changed my work schedule to Thursdays and Fridays, from 8:30 AM to 4:30 PM.

4. I continued working the same schedule from about January 8, 2016 until about May 9, 2016. At that time, I needed to change my work schedule to accommodate my school schedule, because a new semester began and my school schedule changed. In the weeks leading up to May 9, 2016, I e-mailed Office Administrator Kathy Maybaum and Yesenia Negrón in order

- 2 -                    Initials: _____

Case 29-CA-178852                                              July 27, 2016

to ask that my school schedule be accomodated.  As a result, the Employer changed my work

schedule to Tuesdays and Wednesdays from 4:00 PM to 8:00 PM and Thursdays from 12:00

noon to 8:00 PM.

5.  I worked this schedule (Tuesdays and Wednesdays from 4:00 PM to 8:00 PM and Thursdays

from 12:00 noon to 8:00 PM) From about May 9, 2016 until about June 7, 2016.  On or about

June 7, 2016, the new Office Administrator, Dawn Shea told me that my work schedule had

to go back to whatever it was before the Union (meaning 1199 SEIU) was voted in (meaning

Thursdays and Fridays from 8:30 AM to 4:30 PM).  She and I spoke in Dawn's office.

Dawn, Nana Abrakwo (Interim Office Administrator, who was sharing responsibility with

Dawn at the time) and I were the only ones present.  I said, I can't work on Thursdays

because I have class from 9:00 to 12:00.  Dawn said, oh well, I can't do anything about it.  At

that point, I left the office.  That was the end of the conversation.

6.  Since about June 7, 2016, I have only scheduled to work on Fridays, from 8:30 AM to 4:30

PM.  I have worked these shifts, as well as some additional shifts when I am able to pick

them up from other employees.

**I am being provided a copy of this Confidential Witness Affidavit for my review.  I
understand that this affidavit is a confidential law enforcement record and should not be
shown to any person other than my attorney or other person representing me in this
proceeding.**

**I have read this Confidential Witness Affidavit consisting of 3 pages, including this page, I
fully understand it, and I state under penalty of perjury that it is true and correct.
However, if after reviewing this affidavit again, I remember anything else that is important
or I wish to make any changes, I will immediately notify the Board agent.**

Date:  8/4/16          Signature: _Ivisdenia Cassius-Linval_

Ivisdenia Cassius-Linval

Signed and sworn to before me by telephone on _August 26, 2016_

_Brady J. Francisco-FitzMaurice_

**Brady J. Francisco-FitzMaurice, Board Agent, NLRB**

Initials: _____

Case 29-CA-178852

July 27, 2016

need
nres
R. 24
8/31/16
1: 20 PM
er.

- 4 -                    Initials:

# Exhibit J

Meridian Imaging Group
Cases 29-CA-178852, et al.

## Confidential Witness Affidavit

I, __Carmine Randazzo__, being first duly sworn upon my oath, state as follows:

**I have been given assurances by an agent of the National Labor Relations Board (NLRB) that this Confidential Witness Affidavit will be considered a confidential law enforcement record by the NLRB and will not be disclosed unless it becomes necessary to produce this Confidential Witness Affidavit in connection with a formal proceeding.**

My home address is:   150-14 Village Road, Apt. 93GD, Jamaica, NY 11432

My home telephone number (including area code) is  (718) 969-5409

My cell phone number (including area code) is (917) 796-4493

My e-mail address is  ctroy@714@aol.com

I am employed by        Meridian Imaging Group / Queens Medical Imaging

located at       69-15 Austin Street, Forest Hills, NY

1        This statement supplements the affidavit I provided in this case on August 2, 2016.  I

2    wish to provide additional information regarding the effect of the conduct of Meridian Imaging

3    Group (the "Employer") on my co-workers.

4        I have attended each of the three negotiations sessions between 1199SEIU ("Union") and

5    the Employer.  The sessions have been held once per month since July 2016 – one in July, one in

6    August and one in September. All of the sessions were held at the LaGuardia Marriot hotel in

7    Queens, New York.  At the first session, the Union was represented by Union officials Gerard

8    Cadet, Joyce, Hassan (last names uncertain) and Beriza Luciano, in addition to two Union

**Privacy Act Statement**
The NLRB is asking you for the information on this form on the authority of the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the NLRB in processing representation and/or unfair labor practice cases and related proceedings or litigation.  The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006).  Additional information about these uses is available at the NLRB website,                    Providing this information to the NLRB is voluntary.  However, if you do not provide the information, the NLRB may refuse to continue processing an unfair labor practice or representation case, or may issue you a subpoena and seek enforcement of the subpoena in federal court.

Initials _____

| Case 29-CA-178852, et al. | | | Confidential Witness Affidavit |

1   attorneys, current Meridian employees Edwin Martinez and myself, and discharged employees

2   Anthony Randazzo and Sandra Kucuk.  These four employees had been selected by our co-

3   workers as the employee representatives on the Union bargaining committee.  In addition, the

4   Union had asked Maria Lizardo to be on the committee as well ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Maria, however, never came to any

6   bargaining sessions.  When I spoke with her she told me that she was afraid that the Employer

7   would oppose her involvement in the Union because the Employer had challenged her vote

8   during the May 6 election and questioned whether she was a supervisor.  Maria told me that she

9   was unsure that she was even supposed to be involved in the Union at all and that she was afraid

10  that the Employer may fire her if she continued taking a lead role.  Maria has not attended any of

11  the bargaining sessions.

12          Shortly after the first bargaining session, in about late July 2016, I was speaking with

13  Edwin Martinez about helping the Union with its case at the Labor Board to get Anthony and

14  Sandra reinstated to their jobs.  Edwin had previously said he would speak to the Labor Board

15  about the case, but when the day to meet with the Board agent came, Edwin didn't come.  I asked

16  him about it at work several days later, again in about late July 2016.  When I asked him about

17  his failure to speak with the Labor Board, Edwin told me that he was very weary about getting

18  involved with the Union because of the actions the Employer had been taking against employees

19  who were vocal Union supporters.  Edwin told me that he was concerned that Anthony and

20  Sandra had been fired for their Union support and that it didn't seem like they were going to be

21  getting their jobs back any time soon.  Edwin said he could not risk losing his job like Anthony

22  and Sandra did.  I asked him if he was still going to be on the Union bargaining committee and

23  whether he would come to the next negotiating session, and Edwin said he didn't know.

- 2 -                          Initials: _____

| Case 29-CA-178852, et al. | | Confidential Witness Affidavit |
| --- | --- | --- |

1      Edwin did not attend the next bargaining session in August 2016. He also did not attend

2    the negotiation session after that in September 2016. Edwin also has not come to any Union

3    meetings since July 2016. In fact, whereas Edwin used to talk to me about issues in the

4    workplace and what we wanted the Union to do to improve things, he has since July quietly

5    disengaged and no longer speaks with me about anything relating to the Union.

6      I am now the only current employee on the Union bargaining team, now that Edwin and

7    Maria have backed out and Anthony and Sandra have been fired. I have spoken with other

8    current employees about coming to the negotiation sessions, and every other person I've asked

9    about it has said that they are either too busy or that they don't want to be singled out taking such

10    a leading role in the Union. The employees and the Union had originally selected our bargaining

11    committee so that it would have workers from different job classifications or departments in the

12    workplace. Now, without such broad participation in the bargaining process, it has been more

13    difficult for our bargaining committee to understand the needs and wishes of employees in

14    different departments and press those issues in bargaining.

15      Last Sunday, October 2, 2016, we had a Union meeting at the house of one of my co-

16    workers. We had planned this meeting for two week beforehand, and the Union, myself,

17    Anthony and Sandra had strongly encouraged employees to come via social media and by me

18    speaking with people about the meeting in the office. We tried to impress upon people how

19    important it was for people to come and discuss their issues in the workplace and how we would

20    address these issues in bargaining. When I spoke with co-workers about coming to the Union

21    meeting, many of them expressed reservations about going. Many of my co-workers told me

22    that they didn't believe the Union could do anything to stop CEO Alan Winakor from doing

23    whatever he wants to do. They complained to me that employees keep getting together with the

- 3 -

Initials: _____

| Case 29-CA-178852, et al. | | | Confidential Witness Affidavit |
|---|---|---|---|

1  Union to discuss a lot of ideas and improvements in the workplace, but then CEO Alan just

2  disregards the Union and does whatever he wants.  Many people also said that they did not want

3  to take a chance by going to the Union meeting and then Alan finds out and starts targeting them

4  in the same way he went after Anthony and Sandra.

5        Very few employees came to the October 2 Union meeting.  The only current employees

6  who attended were me, ▮▮▮▮ and two other employees, including the person at whose house the

7  meeting was held.  This was extremely low employee turnout in comparison to previous Union

8  meetings that we have had.  During the initial organizing campaign, we had about 25 employees

9  present for the meetings.  As the time went on, the attendance diminished somewhat, but the

10  October 2 meeting was by far the lowest turnout we've had at a Union meeting to date.  The low

11  turnout was especially discouraging given how much we had tried to impress upon people how

12  important it was for as many people as possible to come.

13        Sandra came to the meeting,, and she expressed concerns about continuing to participate

14  with the Union in negotiations.  She stated that she did not know why she was still engaged in

15  bargaining when she doesn't even have a job with the Employer, while other employees who are

16  still employed refuse to get involved in bargaining, or even come to the Union meetings.  Sandra

17  said that she was not sure that her being involved in negotiations was helping her get her job

18  back, and it seemed to me that she was seriously considering backing out of the bargaining

19  committee too.

20        At the last bargaining session between the parties, the Employer offered to return Sandra

21  to work, but in a different position than the one that she used to have.  The Employer offered

22  Sandra a supervisory position, which would be outside of the Unit represented by the Union.

23  Sandra rejected this offer because she wants to return to her former position and wants to work in

- 4 -

Initials: _____ CM

| Case 29-CA-178852, et al. | | Confidential Witness Affidavit |
|---|---|---|

1    a position in which she is represented by the Union. She expressed to the Union bargaining team

2    that she was afraid that the Employer would quickly fire her from the supervisory position it

3    offered her because she would not have any protection from the Union.

4        The morale in the office regarding the Union and the Employer's efforts to undermine the

5    Union and weaken employee support for the Union is now very low. I have spoken with several

6    co-workers about what's been happening in Anthony's case. I told co-workers that the Employer

7    is challenging Anthony's right to receive unemployment benefits. Many co-workers I spoke

8    with about that expressed concern and surprise that the Employer was challenging Anthony's

9    unemployment claim. Several people told me that they saw this as a sign that the Employer,

10    particularly CEO Alan Winakor, would "do whatever it takes" to keep Anthony out and get rid

11    of the Union.

12        Employees at the Forest Hills office are aware of the Employer's supposed basis for

13    discharging Anthony. I have told people that documents the Employer sent to Anthony and

14    those that they submitted in defense of Anthony's unemployment claim show that the Employer

15    alleges that it fired Anthony for insubordination and his violation of a workplace rule regarding

16    "disorderly conduct." Many employees were confused about this supposed rule because it does

17    not appear in the Meridian Employee Handbook that was given to employees, but rather the rule

18    only appears in a rulebook made by Trinet, a Human Resources company that works with the

19    Employer, whicht is available to employees online. My co-workers have expressed to me that

20    the Employer's invocation of this rule, which we were not previously aware of, in order to fire

21    Anthony for standing up for employees and the Union, reinforces that the Employer will do

22    whatever it can to rid the office of Union supporters.

Initials: _____

| Case 29-CA-178852, et al. | | Confidential Witness Affidavit |
|---|---|---|

1   My co-workers are also much more reluctant to speak about the Union while we're in the

2   office than they were before Anthony and Sandra were fired.  Before the terminations, people

3   would speak openly and freely about Union-related issues during breaks and in the lunch room.

4   Now whenever someone speaks to me in the office about anything regarding the Union, they

5   speak in whispers and act like what we are speaking about must be kept secret.  In about late

6   August 2016, the Union sent its agent named Norvelin to our office to speak with employees

7   there.  I helped Norvelin set up in the lunch room, and I was present at the office while she was

8   there for about 45 minutes to an hour during lunchtime.  The Employer made sure that anyone

9   who wanted to speak with Norvelin had to sign out for their lunch break before doing so.  In

10   addition, the Employer had two supervisors who do not usually work at our office walking back

11   and forth through the lunch room for almost the entire time that Norevlin was there.  As a result,

12   only a couple of employees went in to speak with Norvelin in the lunch room.

13   Employees are also very discouraged by the Employer's apparent ability to control our

14   terms and conditions of employment without regard to the Union or bargaining.  CEO Winakor

15   has told us that he is not allowed to change anything because of the presence of the Union, and

16   that is why he will no longer allow employees at the Forest Hills office to work shifts at the

17   Employer's other offices.  However, the Employer has recently brought in to work at our office

18   employees who are based in other facilities.  My co-workers complained to me that the

19   Employer's ability to do this shows them that he can do whatever he wants with the employees,

20   and the Union is powerless to stop him.

21   Many of my co-workers have also complained to me about the Employer's failure to give

22   raises to employees in Forest Hills.  They have said thing to me complaining that the Employer

23   has granted raises to employees in other offices while our wages have been frozen since we

Initials: _____

| Case 29-CA-178852, et al. | | Confidential Witness Affidavit |
|---|---|---|

1   voted in the Union.  Many co-workers have expressed to me that they believe we may have been

2   better off if we had never brought in the Union in the first place.

3        The unit represented by the Union is itself starting to splinter as a result of the

4   Employer's conduct.  Four Sonogram Technologists, who were once vocal supporters of the

5   Union, have quit their jobs with the Employer and are working elsewhere.  Each of them told me

6   that they did not want to keep working for the Employer because they believed that the Employer

7   has been cracking down on employees by nit-picking our work, and they feared that they could

8   be fired for no valid reason, in the way that Anthony and Sandra were fired.

9   ///

10  ///

**I have been given a copy of this Confidential Witness Affidavit.  I understand that this affidavit is a confidential law enforcement record and should not be shown to any person other than my attorney or other person representing me in this proceeding.**

**I have read this Confidential Witness Affidavit consisting of seven (7) pages, including this page, I fully understand it, and I state under penalty of perjury that it is true and correct. However, if after reviewing this affidavit again, I remember anything else that is important or I wish to make any changes, I will immediately notify the Board agent.**

Date:   __October 10, 2016__        Signature:   _____

                                                           Carmine Randazzo

Signed and sworn to before me on __October 10, 2016__ at

__Forest Hillsa, New York__

_____

Matthew A. Jackson
Field Attorney
National Labor Relations Board
Region 29

- 7 -                                        Initials: _____

# Exhibit K(1)

1

2

3

4

5

6

7

8

9

10

11

12

13            **LEVY RATNER, P.C.**

14      **06/17/16 - Noon Meeting Recording**

15

16

17

18

19

20

21

22

23

24

25

1           [START 6_17_16_Noon_Meeting_Recording]

2           [background conversation]

3           ALAN   So this will be either the 20th or the

4      21st - - meeting I have done, and basically, the

5      purpose of this is having been June 1st was the

6      one year anniversary of Meridian, I thought it

7      would be a good idea to give everybody kind of a

8      recap of the first year and remind everybody how

9      we got here and kind of answer some questions

10     and no shortage of questioning from people

11     regarding things to expect going forward, how

12     things are going to work   There were lots of

13     questions regarding you know, the vote for 1199

14     here   So this Town Hall meeting will be a

15     little different in that sense, but just thought

16     it important to kind of give everybody the same

17     general information and then get into some

18     specifics relative to here   So June 1st was the

19     one year anniversary of Meridian and I think it

20     was a good first year relative to how difficult

21     a process it is   Emerging companies   I don't

22     think it could have gone any better, so I wanted

23     to thank everybody for everybody's hard work

24     relative to making the first year a success

25          [applause]

```
 1        ALAN    Did you ever go to a timeshare
 2   presentation and somebody is stupid enough to
 3   buy one - - ?  I would have bought - -    So one
 4   of the things I thought it would have been
 5   important to do is kind of understand how we got
 6   here   So Meridian came about through the merger
 7   of Affiliated Imaging Group and what was NRAD
 8   [phonetic] Management Service Organization,
 9   which they call Blue Dot, and Affiliated came
10   about from the merger of Next Generation
11   Radiology and Metropolitan Imaging Group    So
12   putting groups together is generally difficult
13   and probably that is a function of different
14   corporate cultures    Now usually corporate
15   cultures for those of you following big stuff
16   like Cablevision is about to merge with a Dutch
17   company, and I forget what is the name of the
18   Dutch company, but the Dutch company is going to
19   be taking over Cablevision    When we have
20   mergers especially across countries, corporate
21   cultures are significantly different    In this
22   particular case for all intents and purposes,
23   the niche that everybody was in was pretty much
24   - -    Hillcrest is probably - - less than five
25   miles away from this office    In Nassau County,
```

```
 1    765 Steward [phonetic] Avenue is within walking
 2    distance of the corporate office, 224 7th Street
 3    Hempstead is equally south in walking distance
 4    Next Generation Radiology's office isn't that
 5    far away from 410 Lakeville or 6 Ohio Drive   So
 6    we are all three distinct practices   We are
 7    pretty close to each other, but even in spite of
 8    that operated for whatever reason differently
 9    And that is a function of kind of how they grew
10    up   The management styles of the different
11    groups   David Katz ran Next Generation
12    Radiology the way he saw fit   For all intents
13    and purposes, I ran Metropolitan's group with
14    Dr  Berra [phonetic] and then maybe not so much
15    Dr  Berra, which included here in - - and such
16    And then NRAD was managed by a board of
17    directors and kind of followed their lead
18    relative to that   And each of the different
19    groups under their direction operated
20    differently and handled different items or
21    stress points differently
22        So for example, one of the big reasons
23    everybody is together and under the NYU
24    umbrella, which is an affiliate of NYU, is
25    because for all intents and purposes no matter
```

1    how busy we were, reimbursements have been

2    getting whacked for radiology, and for that

3    matter for the medicine at large basically

4    because the federal government has decided that

5    they want medicine to be more manageable   They

6    want larger groups, which are easier to manage

7    than to have 500 different radiology groups, and

8    the way that they have decided that they are

9    going to get there is to reduce reimbursements,

10   and that is reimbursements and probably

11   radiology got hit hardest and felt it the most

12   because of all of the capital expenditure and IT

13   infrastructure and regulations and difficulties

14   in running a practice like this, but if I go

15   back to December of 2005, before the Deficit

16   Reduction Act of 2006, basically in December of

17   2005, the average reimbursement for an MRI exam-

18   -and this is an average, so it included

19   different body parts and contrast and not

20   contrast, average reimbursement for an MRI was

21   $980 a case on average   At the time we signed

22   the deal to merge Metropolitan Diagnostic

23   Imaging Group with NGR, a former affiliate, my

24   average reimbursement for an MRI was $326 for an

25   MRI   And I can tell you no matter how many MRIs

```
1    we did at $326 an MRI, we were losing money
2    because think about all of the things that go
3    into it   You have got to pay the radiology
4    company for the equipment   You have got to pay
5    for the electric   You have got to pay for the
6    MRI technologist   You have got to pay for the
7    service contract   You have got to pay for the
8    support system  So each group handled those
9    kinds of stresses differently, and it wasn't
10   just MRI   There was equal reductions in all
11   other imaging CPT [phonetic] codes, probably
12   with the exception of mammo for whatever reason,
13   but if you look at what happened in like 2010,
14   those of you who are CT techs and know about CT,
15   it used to be the most popular CPT codes for CT
16   were abdomen and pelvis, and you do two CPT
17   codes for abdomen and pelvis   One paid $240
18   The other paid $220 something dollars, and then
19   all of a sudden, CMS, which runs reimbursement
20   for Medicare, overnight decided that rather than
21   have two CPT codes, there is going to be one new
22   CPT code that represents - - both of those body
23   parts and that new CPT code reimbursed less than
24   each of the individual CPT codes   So overnight,
25   if you got 240 and 220, overnight, you were
```

1    getting $210 for just that one exam--a more

2    than 50 percent cut   So if you have a 60

3    percent reduction of reimbursements for MRIs and

4    you have overnight reductions of more than 50

5    percent for CT and everything goes along, no

6    matter how busy you are, you just have a hard

7    time paying the bills

8        And each of the groups handled it

9    differently   So NGR for example, did across the

10   board cuts for employees, so at one point

11   everybody got a five percent cut in salary, and

12   I don't know the year, but that is the way they

13   handled it, and some of the doctors--well, one

14   of the doctors decided not to draw a salary so

15   he deferred a significant amount of his

16   compensation   NRAD decided to do a couple of

17   things   They also did an across the board

18   salary reduction   They closed offices   They

19   closed pieces of equipment   Everybody handled

20   theirs differently

21       FEMALE VOICE   - -

22       ALAN   They had layoffs   In Metropolitan's

23   case, I kind of did more attrition   We didn't

24   do any reductions   We didn't do across the

25   board salary cuts, but we didn't staff up as

```
 1    much as we should have, and those who were in
 2    the executive area heard me keep saying, we need
 3    to do more with less   We need to do more with
 4    less   We need to do more with less until you
 5    reach the point where there is no more to give
 6    and it's just less   NGR managed to do the deal
 7    with NYU, and basically, it is an - - deal   You
 8    take the volume of patients that you are
 9    currently doing and you now apply NYU rates to
10    them, and all of a sudden, there is more money
11    available, and that is what they did   And that
12    model worked for them, and then when we merged
13    to form AFI, that model worked for us, so that
14    now all of a sudden because NYU has the
15    radiologists and has the IT infrastructure and
16    has the billing and collection and has the
17    marketing department and has the supplies, those
18    expenses are NYU and what they can pay us is
19    enough for us to pay the bills based on our
20    current - -   We are not owned by NYU   We have
21    a license and services agreement, which means
22    every CPT code that we perform, they pay us a -
23    -   And with the fact that they are getting
24    that much more money, and it is significantly
25    more, but not as much as I would have hoped, we
```

1    still get enough money for every CPT code that

2    we can now pay the bills and in turn make

3    investments in new equipment and spruce up

4    because 1980s isn't really a good look any more

5    for medical offices

6        Any questions up to this point?  You are

7    going to make me talk for an hour straight if no

8    one is going to ask questions

9        So we now form Meridian   Things are going

10   like I said, really well relative to putting the

11   groups together, but there are challenges   And

12   one of the biggest challenges is the fact that

13   the executive - - where a lot of effort was put

14   into trying to get NRAD or what used to be NRAD

15   into the system and what made that all the more

16   difficult was a couple of things   NRAD lost

17   some of its executive people   Its board no

18   longer existed as a board, and the fact that it

19   was twice as large as Affiliated, so if we did

20   500 cases a day on average let's say, NRAD does

21   1,000 cases a day, so they were twice as large

22   as Affiliated   And the fact that they had six

23   offices with multiple suites and multiple

24   physicians and had to go live in two stages

25   because in Affiliated's case when we did the

1   deal, we signed the deal June 1st, and we went

2   live on October 24th, so we had almost five

3   months to plan  In Meridian's case, the deal

4   with NRAD, we signed the deal May 28th and went

5   live June 1st, which was basically we signed the

6   deal just before Memorial Day weekend and then

7   we went live right afterwards  So there was no

8   real preplanning  It was like kind of shotgun

9   wedding  We need to get this done and we need

10  to do it as soon as possible and we will worry

11  about everything else afterwards  So a lot of

12  time and effort was put into trying to

13  assimilate NRAD and NRAD patients into Meridian

14  and worse, the NYU system because if you thought

15  that the three different groups practice

16  differently as we all well know, NYU practices

17  much differently than any of the three groups

18  And worse, its systems aren't the kindest and

19  easiest to use and policies and procedures--they

20  ain't so warm and fuzzy either because it is an

21  institution  So all of that time and effort

22  wound up being can we answer the phones, can we

23  register patients, can we process exams, can we

24  get everything done? And to a certain extent,

25  and this is more my fault than anyone else's

1   because I am the CEO or was the president of

2   Affiliated spent a lot less time worrying about

3   what was going on at the AFI side because we

4   spent so much time worrying about what was going

5   on trying to process people - -    And some of

6   the same things we experienced, they experienced

7   long wait times, not answering phones   You

8   know, so a lot of stuff that makes it all the

9   more difficult to really move forward   In spite

10   of that, it was a good year

11      Just like what happened to us NRAD lost some

12   volume, and it has lost volume for a couple of

13   reasons   One is because of some of the changes

14   and the fact that when you keep people sitting

15   in the waiting room for long enough sooner or

16   later they get pissed off and decide not to come

17   back, but also because NRAD was kind of

18   complicated in the way that they were

19   configured   They had a radiology portion of

20   their business   They had a radiation therapy

21   portion of their business   They had what they

22   call MSPs, multi-specialty physicians, and those

23   multi-specialty physicians who were a part of

24   their group sent cases in   When the deal was

25   done, some of the multi-specialty physicians

```
 1    went to the four corners of the Earth   Some
 2    joined - -    Some joined Winthrop   Some joined
 3    Prohealth   A couple joined NYU   But the cases
 4    that they were sending in didn't always
 5    translate to the new deal   But the first year
 6    was good enough that we can afford to - - , make
 7    investments in new equipment because we need to
 8    for as much as you are attached to your 1998
 9    GEMR--
10         [applause]
11         FEMALE VOICE   - - almost a year
12         ALAN   Anyhow, sooner or later no matter how
13    much you love a piece of equipment--
14         FEMALE VOICE   - - five years ago
15         ALAN   But that is exactly the point   The
16    money wasn't there five years ago to get rid of
17    it even though it would have made sense to do
18    so, and it is unbelievable that it is still
19    running, and oh by the way--
20         FEMALE VOICE   It's the only one that
21    actually does run
22         ALAN   That is a different discussion   But
23    be that as it may, in order to be competitive in
24    the environment, you kind of need to invest in
25    equipment, but if you don't have any money, you
```

```
1   can't invest in equipment  So things we have
2   invested in in the first year so far equipment
3   wise, we put in a new 3DMR - - but that is a
4   different story  In the group as a whole, there
5   are 44 ultrasound units  We replaced 22 of
6   them  And ultrasound from what I am told from
7   body imagers and women's imagers in order to be
8   able to properly diagnose whether you have
9   something or not, you really need to be able to
10  see the images, and if you thought our
11  ultrasound imaging machines were old, NRAD's
12  were even older  So the first thing we put
13  money into and they rolled them out so it's
14  easier was replacing half of the ultrasound
15  units  That was a 1 5 million dollar investment
16  in those 22 units  There were a couple of x-ray
17  machines with CR units that were producing
18  really bad artifacts  Those got replaced  We
19  just put in a new CT  We are planning on
20  putting in a new CT here - - month  There are
21  plans for two more MRs and two more CTs  So in
22  order to be competitive, we need to have imaging
23  equipment that reflects that this is 2016 and
24  probably the most important investment we made
25  is in the employees because when all is said I
```

```
 1    done I think the end of the day nobody knows
 2    what is really behind the scenes in the
 3    equipment and nobody knows whether you have
 4    shitty ultrasound equipment or not--also the
 5    radiologist or anybody else or the couple of
 6    doctors who can know and read studies, but
 7    generally, you guys are the face of the company
 8        So whenever we were doing the merger, so
 9    when we merged NGR and AMI, we looked at the
10    benefit package of the two groups and said we
11    were coming together, what is in the best
12    interest to try and merge those together?  And
13    every time I had an opportunity because
14    basically I was the one - - is I always made
15    sure that whoever had the better benefits would
16    move them over to the other group, so whether it
17    was more time off or reimbursements for - - ,
18    reimbursements for some of the licensure, or
19    whether it was for more time off--whatever the
20    issue is, we always tried to make sure that if
21    we were merging and getting better and
22    potentially more profitable that the employees
23    would benefit from that largess and the benefit
24    of the better benefits   And probably the
25    biggest investment in that is when Affiliated
```

```
 1    moved into Meridian and Trinet [phonetic],
 2    which was NRAD's group, the change of benefits
 3    from Magnacare [phonetic] and that was one of
 4    the ways that I was trying to save money because
 5    Magnacare wasn't the best insurance, and we were
 6    self-funded, so I was taking a risk that if we
 7    don't get that sick we will be able to save
 8    money and moved into Trinet with Aetna and
 9    better policies, so we have besides Aetna being
10    better, we have better life and disability   We
11    have better life insurance   We have better
12    dental   We have better eye   All things that I
13    tried to save money on from AFI because we
14    didn't have the money that change of the 170,
15    175 employees for AFI moving to what was the
16    NRAD platform cost the company an extra half
17    million dollars a year, and will continue to
18    cost the company an extra half a million dollars
19    a year moving forward

20        So one of the things that I tried to do
21    knowing who was important to the practice and
22    knowing who my stakeholders are because
23    basically Meridian is owned almost exclusively
24    by the physicians who put all of the practices
25    together and a couple of us who are non-
```

1    physicians, but only a couple of us    I know

2    how well the physicians did, and I know what my

3    responsibility is to them for getting a return

4    on investment for their investment in our

5    practice, but I also know who got us here, and

6    who got us here was the people who do the hard

7    work, which is take care of the patients and

8    answer the phones and deal with the equipment

9    Now I know this job isn't easy, and worse, it

10   has gotten harder    And what has made it harder

11   is the fact that we are on NYU's systems and we

12   have NYU regulations and we have NYU policies

13   and procedures and oh, by the way, - - pay for,

14   it used to be one MRI--in the old days and I

15   will date myself--this week, June 15th was my

16   30th anniversary of doing this   We used to get

17   $1200 an exam for MRIs   At $1200 an exam you

18   can afford to do one MRI an hour   Now we are

19   trying to do 20 minutes an exam, and it is going

20   to continue to get less and less because if you

21   get paid less, you have got to just run faster

22   Picture Lucille Ball with the bon-bons

23        FEMALE VOICE   We all know that show

24        ALAN   In any case, so the patients aren't

25   any - -   The documentation isn't any easier

1    The insurance companies certainly specifically
2    don't make our lives easier   Rumor has it that
3    the referring physicians when you call them up
4    for information because we need a referral or we
5    need to understand what is on the script are
6    sometimes less than cooperative   And I have
7    heard rumors and this may or may not be true
8    that even the radiologists who are a part of our
9    group are less than cooperative or supportive
10   relative to our - -   I know it is just a
11   rumor, but I have heard that that happens, and I
12   have seen it happen maybe once in my 30 year
13   career   That being the case, I always viewed it
14   as my job is to try and make everybody's job at
15   least better if not - - , but it is a job   And
16   the fact remains is it hasn't gotten any easier,
17   and there is really nothing I could do to make
18   it so wonderful   All I can do is try and be
19   supportive and give everybody as much support as
20   I can, and that is true of the whole executive
21   group   Excuse me one second   This is a vodka
22   and tonic
23        [background conversation]
24        ALAN   So in trying to make things better of
25   course having worried about what is going on on

1   the NRAD side of the practice, we didn't pay
2   attention to what was going on on the AFI side,
3   of the practice because we assume having already
4   been in the deal since October of '13, and it
5   being "our sites" [phonetic] that we concentrate
6   on the other sites  And to a certain extent,
7   and this is just my interpretation I bet
8   somebody could throw something up at me if they
9   choose to, but one of the consequences of I
10  think this group voting to be 1199 is the fact
11  that you didn't feel the love or attention from
12  the corporate office, and that was the way - -
13  It is what it is  There is nothing I could do
14  to go back  We can't turn back the clock and
15  show you more time and attention and love  It
16  is what it is, and we are where we are  But I
17  have always viewed it as one of my jobs is to
18  make sure that us the employees--and I am an
19  employee of AFI like any one of us are, though I
20  might have a little more influence than some
21  people--that as best as we can for as much as
22  this is a job and medicine has gotten harder,
23  and it has gotten harder for all of us - -
24  Prohealth - - or Mount Sinai, it is all the same
25  thing  They are trying to get everybody

```
 1   together   They are trying to corral medicine
 2   It has gotten a lot more regulated, and this is
 3   the job we have   Do you want to say something?
 4        FEMALE VOICE   Yes   - -
 5        ALAN   Any questions up to this point?
 6        FEMALE VOICE   Still no questions
 7        ALAN   Which brings us to us here and now
 8   So obviously, you as employees of the Forest
 9   Hills [phonetic] Union voted to go 1199, and
10   this is the point where I discuss - - this is
11   what that means relative to them or us   So for
12   all intents and purposes because 1199 is
13   potentially representing you, it changes the
14   dynamic of you know, how we work together, and I
15   have been trying to think of a good analogy to
16   give you the perspective from my seat on how
17   that would change   So maybe you are going to
18   find this just somewhat ironic whether you
19   appreciate it or not--it would be the equivalent
20   of so when the kids aren't behaving--my kids
21   aren't behaving well, I have yelled at them and
22   disciplined them sometimes, and in the course of
23   disciplining them one of my kids decided I am
24   going to call child services on you, Dad,
25   because I don't like the way you are treating
```

1     me, so I am - -     To which I said, you want
2     to call child services? You think that  is--you
3     are going to have a better deal from them than
4     me?  Knock yourself out   But to a certain
5     extent we now have child services in between us
6     or 1199 - - and I am not disparaging child
7     services or 1199, but there is now an
8     intermediary between us and that affects certain
9     things   And to which I at the other offices I
10    would say--and this is a function of what the
11    rules are for me as an employer relative to the
12    National Labor Relations Board   Once I got the
13    petition from the National Labor Relations Board
14    that we were going to have a vote, I wasn't
15    allowed to say anything relative--it is called -
16    -     I am not allowed to - - in on you   I am
17    not allowed to threaten   I am not allowed to
18    intimidate and I am not allowed to promise   So
19    I can't say--I couldn't say if you don't join
20    the union, I will give everybody 30 percent
21    raises or I can't say if you do join a union, I
22    am going to fire everybody   Basically, I had to
23    say, look, I hope you don't do it   - - and
24    everybody was here for my meeting with Juan
25    [phonetic] to which I was trying to get

1   everybody to keep the status quo, but needless

2   to say, that didn't work

3        What is supposed to happen going forward is

4   the following   The union made a request of a

5   whole bunch of information regarding everybody's

6   salaries and the policies and procures and

7   contributions to all of the benefits, and they

8   are going to look at it   And I would imagine

9   one of the things that the union did to try and

10  get you to vote to join a union is promise you a

11  whole bunch of things that they are going to be

12  able to deliver to you   So if I was the union--

13  and only you guys know what happened, but I

14  would say, oh, I am going to get you annual

15  raises and I am going to get you 401k

16  contributions and I am going to get you more

17  time off, and oh by the way, I am going to get

18  you a contract just like 1199 has with NYU

19  because you are an NYU affiliate

20       The fact is though there is a couple of

21  problems with that   First of all, Meridian is

22  not NYU   We are not a hospital   We are not

23  licensed by the state, so we are different   We

24  are not a non-profit   NYU is a non-profit

25  That means that a whole bunch of taxes that they

1    don't have to pay, we have to pay  And worse,

2    and most importantly, NYU makes money in the B,

3    like in billings, and I can tell you Meridian

4    don't make B [phonetic] money because if they

5    make B money we would be having no conversation,

6    I would be drinking these on the beach

7    somewhere, and it wouldn't make a difference,

8    but the fact remains that whatever the promises

9    that 1199 made to you as employees as being able

10   to get for you they are not going to give to you

11   out of their money; they are going to give to

12   you out of whatever the negotiations are between

13   1199 and Meridian  And whatever those

14   negotiations are going to have to be funded by

15   Meridian  So any of the promises aren't going

16   to come out of 1199 pooled funds  They are

17   going to come out of funds that are negotiated

18   between 1199 and Meridian  And those

19   negotiations can take a week or a month or a

20   year or if you look at what happened locally out

21   on Long Island, the negotiations between 1199

22   and Mercy Medical Center took five years  And

23   Meridian is only going to afford to pay what it

24   can afford to pay  And then you have to ask

25   yourself if the deal here is that much better

1   than the deal at any other location, I wonder
2   what is going to happen at any of the other
3   locations?  So the negotiations are going to
4   take time regardless of what that is and in the
5   interim to a certain extent, we are a status quo
6   meaning that the union has made sure that
7   nothing changes  So things like nothing
8   changes, so if I wanted to give people raises
9   now, I can't  if I wanted to fire somebody
10  because they broke the rules, the union would
11  say I can't except that I can, and they will be
12  pissed off at me  So if somebody does something
13  that is inappropriate and jeopardizes a whole
14  bunch of things that we all know we shouldn't be
15  doing and puts the company in a position where
16  we are forced into having to let someone go,
17  then we will do that  Now will it piss somebody
18  off?  Absolutely, positively  But whatever is
19  going on here, whatever is going on with any
20  individual employee, it is only a function of
21  what is important for the overall organization
22  Now I am going to ask for questions again, and
23  please while I am drinking my drink, somebody
24  ask a question
25          FEMALE VOICE   Why can't people work at - -

1    offices that they used to?

2         ALAN   So that is a good question   So if

3    you are in fact 1199 employees, 1199 doesn't

4    like mixing apples and oranges   So for example,

5    when we wanted to start training people to do

6    fetal ultrasounds, we made a request of NYU, can

7    you please send over people to train us

8    ultrasound techs on doing fetal ultrasounds, and

9    the response was 1199 won't allow us to send

10   people in to a non-union office to train your

11   employees to do that   So to a certain extent I

12   kind of isolated everybody body here   So people

13   who used to rotate one place don't and people

14   who used to rotate in don't because I am not

15   sure what is going to happen as far as the end

16   result of what happens here with 1199   And I am

17   not that anxious from my perspective to have it

18   spread to five different offices because this is

19   difficult enough, and let's see how this goes,

20   but certainly I don't want bring more people in

21   to make it more complicated, and I don't want to

22   - - more people out, so it is complicated

23   someplace else--if that answers your question

24   Does that make sense?

25        FEMALE VOICE   Yeah - - So you don't want

1   people talking about the Union?

2       ALAN    No    Anybody can talk about anything

3   they want, but if you are an 1199 employee, 1199

4   won't let you go to another place that is part

5   of the same organization that is not unionized

6   or worse, you go over there and tell everybody

7   how great the union is and now I have to deal

8   with another unionized office    And oh by the

9   way, here is the other little problem, okay

10  Our biggest competition out in Nassau County

11  certainly is Zwanger-Pesiri Radiology   Okay?

12  Anybody who is - - , so it used to be Zwanger

13  was out East and then on our periphery    So

14  Steve Mendelssohn [phonetic] is opening up

15  offices all over the place    So we just opened

16  an office in Freeport, and that will affect

17  referrals at our Hempstead office and in Garden

18  City, and he is looking to open an office on Old

19  Country Road just west of the mall--Roosevelt

20  Field Mall    That will affect 765 and 224    And

21  he is also looking to open a place on Northern

22  Boulevard, which will affect Great Neck and 410

23  And he is going to open an office in Bayside and

24  in Laurel Hollow - - Laurelton--and rumor has it

25  as of yesterday, he is looking up to open four

1    additional offices in Queens    Steve runs his

2    practice way differently than we run our

3    practice    And we are going to have to be

4    competitive with equipment and processes and

5    patient care in order to be able to compete

6    But no matter how good we are, just like the

7    bagels shop that opens up across the street from

8    your favorite bagel shop, no matter how good we

9    are, or how good we think we are, him opening

10   that many offices is going to affect our

11   volumes    Don't feel like going across the

12   street and waiting on line for your favorite

13   bagel shop, then you get the bagel at the next

14   shop you are at    And by the way, Steve runs a

15   very good shop    There is lots of things that I

16   can tell you that I don't like about it, but

17   from an efficiency standpoint, he is about as

18   good as there is

19        FEMALE VOICE 2    Do they give raises there?

20        ALAN    So Steve did give cuts and about I

21   would think about six months ago, he was losing

22   so much staff, he did an across the board four

23   percent raise    And oh by the way, so I gave

24   raises to other--to about 90 percent of the

25   offices, okay    People who didn't get raises was

1    anybody who was hired by January 1, 2015

2    because they didn't suffer through the eight or

3    ten years of no raises   Anybody who got a raise

4    since January 1, '15 whether because of change

5    of processes, anybody who came in because of the

6    different mergers of the different groups whose

7    salary was so out of whack, now some people here

8    got raises before the whole union thing started

9    on May 1st   Once the thing started on May 1st,

10   we are frozen   So even if I wanted to give you

11   a raise, I can't   And I won't be able to until

12   we final and finish the negotiations between

13   here and 1199   So we are in suspended

14   animation   And one of the reasons why that

15   nobody got across the board raises is because

16   economically we couldn't afford it, but I didn't

17   give anybody cuts because I thought that wasn't

18   fair   It just is what it is   Decisions I made

19   just like decisions everybody else made, we all

20   have to suffer or deal with the consequences of

21   our decisions   So will I be able to give raises

22   to other groups next year? Maybe, maybe not

23   It really depends on volume   Do I think the

24   salaries of the employees as a whole are where

25   they should be?  No matter what I gave

1    everybody, it is certainly not enough to make

2    up for the last eight to ten years of no raises

3    If we have a good enough year in our second year

4    of Meridian, I will probably do salary

5    adjustments at that point, and then maybe at

6    some point, we will get to 401k matches for or

7    tuition reimbursement or anything else that

8    would seem to be worthwhile   But any of those

9    things are in suspended animation relative to

10   what happens between me and 1199

11        Questions?  I will go through some of the

12   other questions that some of the other groups

13   had asked because I solicited all of those   So

14   here is a popular one   I got lots of these

15   When are we getting more money?  Even if I

16   wanted to, I can't   Go ahead

17        FEMALE VOICE 3   Well, I totally understand

18   that no changes can be made and aren't being

19   made, but like not letting - - one change

20   allowed, but other changes aren't

21        ALAN   Because the other offices aren't

22   under 1199 - - , those are separate and here is

23   here   So I have just isolated what is going on

24        FEMALE VOICE 3   Even on the - - agreement

25   of what - - ?

1       ALAN   I have been told by my attorneys

2   that what happens here is supposed to be status

3   quo   Okay   What happens other places, I am

4   free to do with whatever is in the best interest

5   of all of us   My decision

6       FEMALE VOICE 2   What about hiring?

7       ALAN   Hiring?  If we need staff, we will

8   hire

9       FEMALE VOICE 2   Well, we are short staffed

10      ALAN   We are hiring   Say it again

11      FEMALE VOICE 2   And we have been short

12  staffed   My department is short staffed

13      ALAN   Your department?

14      FEMALE VOICE 2   Scheduling   We are short

15  staffed

16      ALAN   So, we are looking for people

17      FEMALE VOICE   Somebody was hired a week ago

18  and started in Garden City   Maybe - - didn't

19  let you guys no

20      FEMALE VOICE 2   But that is not here

21      FEMALE VOICE   - - answering the phones for

22  here

23      FEMALE VOICE 2   It's totally different

24  because if the phones were to go down again, you

25  can clearly see with the numbers what happened

1   with Garden City and Queens  We still doubled

2   their numbers with the phones being down  Are

3   you really going to hire somebody else to go to

4   Garden City when it is really needed here?

5       ALAN  Well, here is the problem  - - 1199

6   - - complicated

7       FEMALE VOICE 2  It's one person

8       ALAN  I am hiring an MR tech  he starts in

9   a couple of weeks  I am going to staff up so we

10  can adequately take care of our patients  Okay

11  And by the way, one of the things we are

12  investing in is a new phone system so all 11

13  sites 'cause right now we have five different

14  phone systems, all 11 sites can be connected

15  We will staff up to be able to take care of

16  patients  And one of the questions was, you

17  know, why do we take so many add-ons?  So that

18  is a fair question  Or why should we take an

19  add-on at five to five when our shift is

20  supposed to end at five o'clock?  And here is my

21  thought on that  First off, we get paid per

22  click  Alright  So everybody who shows up and

23  we image, we get paid for  That is kind of why

24  we are in business, but more importantly,

25  anybody who shows up at our door is sick or

1    needs information relative to their health

2    We have all of this equipment   We have all of

3    this real estate   We have all of this

4    infrastructure and we have all of these

5    employees   If some stupid patient is stupid

6    enough to show up at our door, I kind of feel

7    like it is our obligation to maybe, I don't

8    know, take care of them   If it was you or your

9    parent or family member, and you showed up at

10   our door, you would expect that if I am here and

11   the lights are on, we will take care of you

12   Now if the doors are locked and it is after

13   hours, then so be it   But if it is five to five

14   and the office is open, this is the profession

15   we chose   It is not a bank   We don't get to

16   choose that nope, you can't put the money in or

17   take the money out   If a person is sick, it is

18   our moral obligation and our mission to be able

19   to take care of them   And if people during the

20   hours we are open and there is an opening in the

21   schedule, those aren't add-ons   Those are empty

22   slots   An add-on is when we have too many

23   people and we are trying to squeeze somebody in

24   Is it inconvenient? Yeah   Does it interfere

25   with work flow?  Absolutely positively   But

1   that is what we are in the job for   If too

2   many people show up at McDonald's, they don't go

3   oh, we are not in the mood to serve more

4   hamburgers   People want hamburgers, we give

5   them hamburgers

6       CARMINE   It's not being realistic   You're

7   not being fair

8       ALAN   Explain which part isn't fair?   The

9   add-ons?

10      CARMINE   You are saying that we are here to

11  help everybody, and I think that is across the

12  board - - so when you are here from five to five

13  we are going to take somebody   That is going to

14  take until 5 30, 6 o'clock--hold on--5 30, 6

15  o'clock per se   - - by the time you are out of

16  here it's an extra hour, two hours   That

17  happens to us too frequently

18      ALAN   Well, first of all, I hate to say

19  this, but that is not your per se department,

20  and that is not what you are licensed or trained

21  to do   No offense

22      CARMINE   I am not saying it is   I am just

23  - -

24      ALAN   So if it was you showing up, okay, at

25  five to five, and you are right, the equipment

1    goes down, the patient before you--sometimes

2    you get stuck--and by the way, I don't expect

3    anybody to leave anybody's kids sitting on a

4    street corner waiting for mom or dad to show up,

5    if you have to go  If you have got to go, okay,

6    you have got to go  Shit happens  On the other

7    hand, if you are working at five o'clock and you

8    scheduled a piano appointment for 5 30 and it

9    takes you a half hour to get home without

10   traffic, then you are in the wrong business

11   because you say no, but I am sorry  I think it

12   is bad policy to turn somebody away if they

13   showed up at the door and we are open  My

14   decision--

15       CARMINE  But that is exactly what I am

16   saying--your decision  Basically we could be

17   open until midnight if people are coming through

18   that door  Wouldn't you say?

19       ALAN  No

20       CARMINE  No?

21       ALAN  No

22       CARMINE  I think you are wrong

23       ALAN  Okay

24       CARMINE  Okay  This place is filled at 12

25   o'clock - - if we need the patients to be

1    scheduled, I am pretty sure a lot of people

2    would come.   - -

3        ALAN   If I could find staffing for 12

4    o'clock, I would be happy to do so, but I

5    wouldn't expect the staff that showed up at 8

6    o'clock to work until 12 o'clock

7        CARMINE   Well, it just goes back to what we

8    are saying   You said - - about licenses

9    People don't want to be here all night

10       ALAN   I don't expect them to be here all

11   night

12       CARMINE   Okay

13       FEMALE VOICE   How many people are leaving

14   an hour after their shift?  Okay

15       ALAN   How often does that happen?

16   MALE VOICE 2   Every Monday

17       ALAN   Every Monday   Okay, so on Mondays we

18   are short staffed on covering   Alright   So

19   then we need to do something about it   How

20   often does it happen for you?

21       FEMALE VOICE   Every Monday you leave an

22   hour late?

23       MALE VOICE 2   Close to an hour   Close to

24   an hour

25       [crosstalk]

1     FEMALE VOICE   On average, half hour?

2     Everybody is leaving at least a half an hour

3     past their shift?  So everybody is generally

4     leaving around their eight hour shifts?  Okay

5     I just wanted to take a vote to see how many

6     people are leaving an hour afterwards

7         FEMALE VOICE 2   Well, most of us here are -

8     -

9         [crosstalk]

10        FEMALE VOICE   Okay   We will take the same

11    vote in the next group, so this way we can at

12    least make sure we address the evening people as

13    well

14        ALAN    Look    The reality is for me, my

15    expectation we have a schedule we will keep to

16    the schedule   Does stuff happen that affects

17    the schedule?  It does--whether it is the

18    equipment going down, or a patient moving or

19    somebody needing more imaging   Okay?  You are

20    not chained to your desk and that is not the

21    expectation, but I happen to disagree   Okay?

22    So I run the practice and he runs cleaning the

23    office, but we disagree that I think if somebody

24    shows up when we are open unless it is going to

25    be a case that puts the patient in danger or

```
1    doesn't put somebody so out of their way that
2    they are leaving somebody hanging on a street
3    corner, I think it is our moral obligation and
4    our mission to take care of them   I guess if we
5    have this disagreement we are going to be
6    negotiating that between us and 1199, but I can
7    tell you that the contract between NYU and 1199
8    says that you are not allowed to turn away
9    patients   Okay? Because that is the mission
10        ANTHONY   Aren't you supposed to get paid
11   overtime if you go past your shift?
12        ALAN   Sure   Of course we do
13        ANTHONY   People aren't getting paid
14   overtime
15        [crosstalk]
16        ALAN   Absolutely, positively not correct
17        ANTHONY   No, because you have to work more
18   than 35 hours to get the overtime
19        ALAN   No
20        [crosstalk]
21        ANTHONY   If I work eight hours, and I got
22   to stay a half hour, you are going to pay me a
23   half hour overtime rate?
24        ALAN   That is not the regs   That is not
25   overtime
```

```
 1        ANTHONY   That is what overtime is   I
 2   worked past my shift, I get paid over time
 3        ALAN   You let me know when I can speak
 4        ANTHONY   You can   It's your office
 5        ALAN   No, I will wait until you finish
 6        ANTHONY   I am making a point   If I work
 7   past my shift, I get paid extra   Yes or no?
 8        ALAN   No
 9        ANTHONY   Then why should I stay?
10        ALAN   Okay, so can we discuss what the law
11   is?
12        ANTHONY   Sure, but shouldn't that be for
13   when we have our negotiations?
14        ALAN   Can we follow what the law is?
15        ANTHONY   Sure
16        ALAN   Okay   What is the law, Anthony?
17        MALE VOICE 2   You tell me
18        ALAN   No   Okay   The law is I need to pay
19   overtime when somebody works more than 40 hours
20   a week   That is the law
21        ANTHONY   Okay
22        ALAN   Okay   It is not eight hours   So if
23   you work 10 hours that day, okay, and then the
24   rest of the week you didn't work, you don't get
25   overtime for those two hours, and by the way, I
```

1   am not making up the rules by myself   I have
2   to follow what the state and federal government
3   tells me to   If you work more than 40 hours,
4   you will get 1 5 times your salary
5        ANTHONY   Okay
6        ALAN   It is considered on a week
7        ANTHONY   Nobody wants to stay past their
8   shift
9        ALAN   You may not want to stay past your
10  shift   Okay
11       ANTHONY   Anybody want to stay past their
12  shift?  No
13       ALAN   Okay, so I will tell you what   You
14  guys, for the two of you who clean the office,
15  you are the cleaners of the office   You don't
16  take care of patients   From this point forward,
17  not a second after your time
18       ANTHONY   Okay
19       ALAN   Alright   And I will hire a cleaning
20  crew to come and supplement whatever needs to be
21  done   Okay   But you are not licensed   Okay
22  You didn't go to school
23       CARMINE   You don't have to be licensed,
24  Alan   Let's get that straight   We don't have
25  to be licensed to make a discussion   We don't

1    have to be licensed

2         ANTHONY    What about the girls up front?

3    They are not licensed, but they are staying past

4    eight o'clock because you have brought another

5    patient in    They want to go home

6         CARMINE    This is going on the regular, and

7    this is why we are in the position that we are

8    in

9         MALE VOICE 2    Every day

10        ALAN    What position is that?

11        CARMINE    That is 1199    That is the

12   position

13        ALAN    Okay, so, so--

14        CARMINE    That is the position, just like

15   you used the analogy of the--

16        ALAN    Why don't you do this?  Tell me what

17   hours you would like the office open to    You

18   decide

19        CARMINE    You are the boss    It's your

20   place

21        ALAN    No, it's not my place

22        CARMINE    Yeah, it is    If it was--it is

23   your office    If it is open until eight, it is

24   open until eight, and that should be the end of

25   it

```
 1        ALAN    And what happens if the patient is
 2   still in the scanner, do we just throw them out?
 3        CARMINE    That is what happens here all of
 4   the time    No    No    Come on    Let's be
 5   realistic
 6        ALAN    But I am asking you    Do we throw the
 7   patient out?
 8        CARMINE    Never    Never    Never    Never
 9   Never
10        [crosstalk]
11        MALE VOICE 3    We are not talking about
12   that
13        ALAN    But that is the mission we are in
14        CARMINE    Come on with this bullshit    Stop
15   Come on    You are sitting here talking about
16   stuff that we should all be negotiating about
17        ANTHONY    Right    That is not what this
18   meeting was about
19        MALE VOICE 3    That's right
20        ALAN    I am not negotiating anything    I am
21   just telling--
22        ANTHONY    That is not what this meeting was
23   about
24        ALAN    Look, guys--
25        [crosstalk]
```

41

```
 1        ALAN   Anybody else other than the
 2    janitorial crew have anything else - - ?
 3        ANTHONY   If you were able to get this
 4    meeting together, you could easily get a
 5    negotiating meeting together, and we can discuss
 6    it then and not in front of everybody
 7        ALAN   We are not negotiating   The union
 8    made a request   We are putting the information
 9    together   Okay?  And if you want to discuss or
10    negotiate janitorial services, I am happy to do
11    so
12        ANTHONY   Alan, listen   Stop with this
13    janitorial bullshit, okay?  Stop it   Alright
14    You're being a wise guy
15        ALAN   I am?
16        ANTHONY   Yeah
17        ALAN   Just out of curiosity what is your
18    job description, Anthony?
19        ANTHONY   Yeah, janitorial   Okay   I am
20    probably more professional in my life than you
21    have ever been, so just stop it
22        ALAN   Okay
23        ANTHONY   I don't know who you think you are
24    talking to, the second time, the second time
25    Okay   You are a professional?
```

```
 1          ALAN    No, Nana let him stay    I don't
 2     have a problem with it
 3          ANTHONY    Far from a professional, okay
 4     Far from a professional
 5          [audible noise of door closing]
 6          ALAN    That's appropriate
 7          MALE VOICE 5    Hey, he's upset    Everybody
 8     is upset in here, bottom line
 9          ALAN    About what?
10          MALE VOICE 5    Everything you're trying to
11     discuss
12          ALAN    Really?  You think I am happy about
13     the fact that I saw our reimbursements go from
14     $980 to $326, and I am supposed to make ends
15     meet?
16          FEMALE VOICE 3    You just gave raises to
17     every--you said 90 percent of the company
18          ALAN    That is correct    That is after doing
19     the Meridian--
20          FEMALE VOICE    Are we to pretend that you
21     didn't?
22          ALAN    Um, no you're not - - but what am I
23     supposed to do?
24          ANTHONY    I have every right to be in this
25     room   Nobody puts me down
```

```
 1        [crosstalk]

 2        ANTHONY   Who do you think you are talking

 3   to, Alan?  Okay?

 4        ALAN   I'm sorry this is still my office

 5        ANTHONY   I'm a professional, okay

 6        ALAN   If you want to curse at me you have

 7   to leave

 8        ANTHONY   I'm not cursing   I haven't cursed

 9   at you once

10        ALAN   You already just did   I am sorry you

11   just told me to go fuck myself

12        ANTHONY   No, I never said that

13        ALAN   Really?

14        ANTHONY   Yeah

15        ALAN   I didn't hear you say that?

16        ANTHONY   No, I didn't say that

17        ALAN   Okay

18        ANTHONY   Okay   I have the right to be in

19   this room

20        ALAN   Um, I don't know about that, but if

21   you feel--

22        ANTHONY   If you have a battle with the

23   janitorial services, you bring it to us

24   privately   Okay?

25        ALAN   That is fine
```

```
 1        ANTHONY   No, it is not fine because you
 2   are the one with the big mouth that keeps
 3   bringing it up   We need a license to be a
 4   janitor? Is that something funny? I don't
 5   think it's funny
 6        ALAN   No, my point was is that--
 7        ANTHONY   What point?
 8        ALAN   My point was that people who go to
 9   school and got licenses for being technologists,
10   okay, may have a different expectation of what
11   the job description is that you do   That is my
12   point   Whether you like it or not, that was
13   just my point   You can disagree with it   I
14   have no problem with it   Okay? But everybody
15   has different expectations, including me being
16   the boss   My expectation is whether you like it
17   or not, okay, is that if somebody shows up when
18   we are open, I feel it is our obligation to take
19   care of them   That is my perspective   Does
20   that always work? No   Will that always happen?
21   No   Will it be inconvenient to any of us? Yes
22   I keep my cellphone on   If somebody wants to
23   call me at 5 o'clock in the morning on a Monday
24   because they have a problem, you will never hear
25   me say why are you calling me? That is my
```

1   obligation   We all have different

2   obligations   Okay?  My obligation as best as I

3   can is trying to make sure that we serve the

4   patients, we serve our referring physicians and

5   as employees and stakeholders of Meridian, we

6   can all do okay   Trust me   It was a lot more

7   fun 30 years ago when I was getting $1200 for

8   one MRI   It's a hell of a lot less fun for what

9   I got going on now   But it is what it is   And

10  as such, we all have to deal with it   Am I glad

11  I am not at the beginning of my career?  Damn

12  straight   Unfortunately, I am not at the end

13  yet   I only have 30 years in   Am I making

14  every decision that is the right decision?  I

15  hate to disappoint everybody, I am not that

16  bright   And obviously I have people who are

17  unhappy   We are going to have to deal with

18  that   Am I going to be able to make everybody

19  happy?  Probably not   The best I can do is try

20  and make most of us happy

21        FEMALE VOICE 5   Can I say something?  In

22  terms of healthcare, being in my eyes different

23  than-we are not selling sweaters at Macy's or

24  Lord and Taylor, we are in a patient people

25  business, that is different   Healthcare to me

```
 1    is someone coming to you and saying this is my
 2    life or my loved one's life, and I am trusting
 3    you with it   We have all been in that situation
 4    where we go to someplace and think what would we
 5    want for our own loved ones if we showed up and
 6    needed care because frankly, nobody wants to--it
 7    is not like we are giving away anything that
 8    people would stand in line and buy a ticket for
 9    if they had a choice   They need help   Having
10    said that and being just in the past year--I am
11    from NRAD, and we did--we laid off a lot of
12    people due to financial situations and we cut
13    back and we were as bare bones as you can
14    imagine and so people were winding up having to
15    work an inordinate amount of hours, but what has
16    happened since the merger is that the need in
17    each individual's situation, each practice, each
18    office, each modality, what are the hours that
19    are needed to care for patients and then we
20    being staffed appropriately   I think that is
21    what we are saying here also - - asking    If
22    there is a chronic situation where one
23    department or one person or one shift is always
24    being asked over--and I am not talking about
25    once in a while, but it is going to be looked at
```

1    and it will be reevaluated and staffed because

2    we don't want to get into tons of overtime   We

3    don't have people chronically staying

4        ALAN   You know, this office is the busiest

5    office in the group   Okay?  At some point when

6    Zwanger-Pesiri moves in to our neighborhood, it

7    is not going to be the busiest office in the

8    group   Okay?  Whether we can keep three MRs

9    going, great   Anybody who knows and - -

10   diagnostic imaging - - Fisher's office had three

11   magnets, two CTs, they would do 1200 MRIs a

12   month, 1200   That is about what we do here in a

13   month   1200 MRIs, 1,000 CTs   That practice is

14   gone   She didn't get paid out   She just merged

15   it into NRAD and she is gone   Things change

16   The fact that we are busy is a good thing   And

17   if we do decide that we are going to start

18   turning people away at whatever time we do,

19   there is going to be someplace else that they

20   are going to go   And when they start going

21   there and all of a sudden we are not open until

22   eight and we are open to seven and we are open

23   to six and we are open to five, then think of

24   the discussion that we are going to have   So

25   the fact that we have people wanting to show up

```
1   we are fulfilling our mission   Again, my
2   opinion   You may disagree   From a management
3   perspective, we are not staffed to try and force
4   anybody to stay at their desks   If we need more
5   staff so that people don't get chained to their
6   desks, then we will hire more staff   If it is a
7   systematic problem, then we will deal with it
8   If they don't want to stay any more than they
9   have to stay, then they don't have to stay   I
10  will get somebody else to clean the office   I
11  will get somebody else to answer the phones   I
12  will get somebody else to do an ultrasound   If
13  it is a systematic problem, it is not meant to
14  be a punishment   We are trying to take care of
15  patients
16        [background conversation]
17        FEMALE VOICE   - -
18        ALAN   Zwanger is a freestanding facility
19  and Zwanger's offices always stay up until 8
20  o'clock and Zwanger says if you call the front
21  desk and you ask to come over, the person at the
22  front desk doesn't ask the tech, doesn't ask the
23  radiologist, doesn't ask anybody   They say come
24  over   And that office stays open until that
25  person is seen   Period   End of case
```

1    FEMALE VOICE  What makes them different
2    from how office - - ?
3    ALAN   They are different in a lot of cases
4    Their volume is probably twice the volume of
5    even this office  They use a lot of IT
6    infrastructure for being more efficient   They
7    hire pretty green technologists and then they
8    have somebody in the back office who can look at
9    all 30 MRI scanners at once  So they have
10   somebody who is monitoring what is going on, and
11   if somebody is going to make a mistake on an MRI
12   scanner, the guy in the back room fixes it, but
13   they pay everybody really minimum wages, and
14   then when you get tired of working like that,
15   you move on and move out  They are staffed with
16   minimum staff  The staff only takes care of
17   what they have to and they don't have their
18   staff stay in an individual office   They
19   rotate, so nobody gets deep roots  He is very,
20   very, very efficient  He really is, and I am
21   telling you he does twice the volume that we do
22   in his offices partly because of--I will give
23   you an example, answering the phone  When you
24   call into his office, it is connected into his -
25   - , so - - called his office to schedule in a

1      patient, my demographics show up on the

2      computer   Now he doesn't say hello, Alan when I

3      call because that gets a little creepy and you

4      feel like big brother is watching, but your

5      demographics and information are already up in

6      front of you   So when you say hello, who am I

7      speaking with?  Oh, Alan - - , I am already

8      there   It is not looking for it, waiting for it

9      to populate and do it   he has systems--and

10     unfortunately, we have NYU systems   Just

11     different   Yep?

12         FEMALE VOICE   I wanted to ask you, you say

13     you have five different phone systems and you

14     said you are looking to merge it, and when you

15     look to merge it are you going to make the

16     schedulers because when we were down on the

17     phone system, we had four schedulers, and our

18     numbers speak for themselves on - - and how much

19     phone calls were coming in   We are the first

20     voice they hear when they call

21         ALAN   I know that   So the idea is that for

22     the scheduling department everybody will be

23     connected and everybody will be able to balance,

24     but honestly, if one site goes down, right now

25     you are connected to Garden City   The idea is

1   that all 11 sites will be connected so that if

2   any one site goes down, then it will get

3   dispersed to everybody else and balanced out

4         FEMALE VOICE    But my question is are we

5   going to be scheduling for all of the sites or

6   are we going to be scheduling only for our site

7   or Garden City?

8         ALAN    I don't know that we have gotten that

9   far into it    I would like to be able to have a

10  system that where you are calling from it

11  directs you to your spot, but I haven't gotten

12  that far yet    But my expectation is that for

13  example, if we are going to have areas of

14  excellence, so for example, not every place will

15  do prostate exams    Not every place will do

16  MRMs    Not every place will do - - cases    We

17  will use assets where they are needed, but

18  ideally, the people who are at a site will take

19  care of the stuff at the site, which has kind of

20  always been the case between you and Garden

21  City, but it depends on when stuff happens    No

22  telling what happens with infrastructure    It

23  took them five days to figure out why they

24  couldn't boot up the ACD

25        FEMALE VOICE    That is exactly my point

1    The volume of the calls coming in and us being

2    short, it was under four schedulers only with

3    that massive amount of phone calls coming in

4         ALAN   I know and I appreciate your hard

5    work

6         FEMALE VOICE 5   One of the things that

7    happened with NRAD also was when Hillcrest

8    became part of NRAD - - at that point, like

9    being able to see other offices   Maybe you

10   could only schedule mainly for one, but seeing

11   other ones that are nearby if you are overloaded

12   and there is an opening somewhere else, the

13   patient might choose to go where there is a

14   sooner opening

15        FEMALE VOICE   But the call would be better

16   distributed to that center because let's say all

17   of the centers are popped up on the screen for

18   us, it is just too much for us to schedule when

19   the phone calls are coming in because as soon as

20   you put one down, another one is coming in

21        ALAN   Right   So the idea is trying to

22   direct Queens' cases to Queens and Garden City

23   cases to Garden City or any other site   It just

24   so happened when we put the phone system

25   together we connected you two   When we go for

```
 1   all 11, it will be organized much differently
 2   That won't happen--well, it has to happen by the
 3   end of the year   It probably won't happen until
 4   the fourth quarter because it is a little
 5   complicated   Look, I hope you found this
 6   worthwhile   I am sorry that it got a little
 7   heated   There is nothing I can do   There is no
 8   way--we can't turn back the clock   Like I said,
 9   even if I wanted to do something now, I am kind
10   of in a position where I have to wait to see how
11   things pan out   The negotiations could be quick
12   and easy or they cannot be quick and easy and be
13   complicated and long running   Not what I want
14   to do   Not the position I wanted to be in, but
15   we all have to deal with the hands that we are
16   dealt with   I appreciate your hard work   I
17   appreciate your time   I am sorry the pizza
18   didn't show up on time   - - you guys are all
19   eating   Thank you   If anybody has any other
20   questions or thoughts, you can e-mail me
21   directly   All of the questions everybody asked
22   we are going to be putting a newsletter
23   together, so all of those questions, so if there
24   is 30 different questions, you will have 30
25   different answers   Some of the stuff relative
```

```
1     to here if you have questions about stuff, ask
2     me a question, I will always answer it    The
3     worst question is the one not asked    Thank you,
4     guys
5          [background conversation]
6          [END 6_17_16_Noon_Meeting_Recording]
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1           C E R T I F I C A T E

2           The prior proceedings were transcribed from

3    audio files and have been transcribed to the

4    best of my ability   I further certify that I am

5    not connected by blood, marriage or employment

6    with any of the parties herein nor interested

7    directly or indirectly in the matter

8    transcribed

9
                    _Amoury Campbell_
10       Signature

11       Date   October 5, 2016

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit K(2)

## To be filed ELECTRONICALLY ONLY

# Exhibit L(1)





224 Seventh Street, 3rd Floor
Garden City, NY 11530
Tel: 516-616-5000 | Fax: 516-747-6550

June 17, 2016

Mr. Anthony Randazzo                    Via FedEx

141-18 79th Avenue #Apt. 2F

Flushing, NY 11367

Dear Mr. Randazzo,

This letter is to inform you that, based on your insubordinate behavior at this afternoon's Town Hall meeting, hosted by Alan Winakor, CEO of the Meridian Imaging Group, your employment with Meridian Imaging Group, LLC and Trinet is terminated, effective immediately.

Any personal possessions you may have in the office will be packed up and sent to you. You are prohibited from visiting the premises of Queens Medical Imaging, 69-15 Austin Street, Forest Hills, NY or any other Meridian Imaging Group location.

Yours truly,

Cheryl Kurman

Director of Human Resources

Cc: Alan Winakor, CEO

# Exhibit L(2)



**ERIDIAN**
Imaging Group, LLC

224 Seventh Street, 3rd Floor
Garden City, NY 11530
Tel: 516-616-5000 | Fax: 516-747-6550

June 20, 2016

Mr. Anthony Randazzo                    REVISED
141-18 79th Avenue #Apt. 2F             Sent Via US Mail/Certified Mail
Flushing, NY 11367

Dear Mr. Randazzo,

This letter is to inform you that you exhibited insubordinate behavior at the Friday, June 17th, 2016 Town Hall meeting, including disorderly conduct and directing profanities at the meeting host and CEO Alan Winakor, of the Meridian Imaging Group. Chapter Two of our Trinet Employee Handbook states the following are conducts that are "impermissible and that may therefore lead to disciplinary action, possibly including immediate discharge:

- Fighting, horseplay, practical jokes, or other disorderly conduct that could endanger or disturb any employee, contractor, customer, or vendor of or visitor to the company.
- Inappropriately threatening, intimidating, bullying, or coercing any employee, contractor, customer, or vendor of or visitor to your company, in any manner, including by use of abusive or vulgar language."

As a result, your employment with Meridian Imaging Group, LLC and Trinet was terminated, effective June 17, 2016.

Any personal possessions you may have in the office will be packed up and sent to you. You are prohibited from visiting the premises of Queens Medical Imaging, 69-15 Austin Street, Forest Hills, NY or any other Meridian Imaging Group location.

Yours truly,

Cheryl Kurman
Director of Human Resources

Cc: Alan Winakor, CEO

# Exhibit M



**MERIDIAN**
Imaging Group, LLC

224 Seventh Street, 3rd Floor
Garden City, NY 11530
Tel: 516-616-5000 | Fax: 516-747-6550

June 1, 2016

Ms. Sandra Kucuk                    sent via Email and Certified Mail
72-19 72nd Place, 2nd floor
Ridgewood, NY 11385

Dear Ms. Kucuk,

This letter is to summarize the information regarding your status which you have provided to Meridian Imaging Group, LLC. You requested and were approved for twelve weeks of Family Medical Leave, which began on February 12, 2016 and which was officially exhausted as of May 5, 2016. However, you were unable to return to work at that time and requested a personal Leave of Absence, for an additional six weeks (through June 16th, 2016). We granted your request for the extension with the hope and the assumption that you would be able to return to your position as a full time MRI technologist at that time.

You provided a letter from Dr. Verma dated 4/21/16, stating you were still unable to return to work and would be re-evaluated on 5/26/16. Dr. Verma provided an updated letter regarding that re-evaluation which we have just reviewed.

Dr. Verma's letter states you are sufficiently recovered to return to work in a part time capacity. He states "no bending, no lifting anything greater than 5 lbs. or twisting" Unfortunately, these limitations will prevent you from performing the necessary requirements of your position as an MRI technologist.

You have several weeks until your personal leave of absence extension is exhausted. If, by June 17, 2016, you are able to return without limitations that prevent you from performing the necessary requirement for your position as MRI technologist, documented by your physician, we will be happy to have you return. However, if you cannot, then we will be terminating your position with Meridian/Trinet as of June 17th, 2016.

Please let me know immediately, via return email, if I have missed anything. In the meantime, we all wish you well and should you not be able to return by June 17th, we would encourage you to reach out to us upon your recovery to explore employment opportunities. Also, should you not be able to return, we will be providing information to you regarding COBRA election, etc.

Yours truly,

Cheryl Kurman
Director of Human Resources

Cc: Alan Winakor, CEO

# Exhibit N

**Jackson, Matthew**

| | |
|---|---|
| **From:** | Sandra Miladinov <mmilad5702@yahoo.com> |
| **Sent:** | Wednesday, July 13, 2016 12:35 PM |
| **To:** | Ceilidh B. Gao |
| **Subject:** | Fw: return to work |

On Tuesday, June 14, 2016 5:40 PM, Sandra Miladinov <mmilad5702@yahoo.com> wrote:

On Monday, June 6, 2016 1:06 PM, Cheryl Kurman <CKurman@nrad.com> wrote:

I'm on jury duty today (on break) - hopefully will be back tomorrow

it's not a matter of our telling you what restrictions we can have you return with.  It's a matter of your MD, based on his knowledge of your situation, informing us of what, if anything, you cannot do.  So, for example, if you cannot stretch, bend or lift anything greater than 5 lbs) - I don't have your letter here with me - those tasks are necessary to do the basic requirements of your job.  If you are able to return with no restrictions but for PT hours, I would think we could allow you to return PT for the two weeks you mention but, again, it's not our place to advise your MD what restrictions he would recommend for your wellbeing. The two of you would have to evaluate that so that, one, you can do your job and, two, more importantly, you do not further injure yourself.

Marilyn    Please forward to Alan for me. .I don't have his email address handy and have to go back to the jury room.

Thanks.

Please forgive any typos. .thanks

_____

From: Sandra Miladinov [mmilad5702@yahoo.com]
Sent: Monday, June 06, 2016 11:38 AM
To: Cheryl Kurman; Jennifer.Fuggio@nyumc.org
Cc: Marilyn McCarthy; marybel.colon@nyumc.org
Subject: Fw: return to work

On Monday, June 6, 2016 10:32 AM, Sandra Miladinov <mmilad5702@yahoo.com> wrote:

Hello all,
Hope all is well. So as per our previous email convo. I would like to know what kind of restrictions are you willing to work with and for how long will you like the parttime schedule to be because I can't forsee it going past 2 weeks. Once i spoke with the doctor he was willing to write a letter that indicates what my employers are agreeing to as long as I am ok with it. Like we discussed before its

just to ease myself back into regular duty and to see if I can handle the physical aspect of the work.
Please let me know I'm willing to work with you guys to get this ready for my return.
Sandra
if it's easier to speak with me please call 917-842-7184

# Exhibit O

**Jackson, Matthew**

| | |
|---|---|
| **From:** | Sandra Miladinov <mmilad5702@yahoo.com> |
| **Sent:** | Wednesday, July 13, 2016 12:36 PM |
| **To:** | Ceilidh B. Gao |
| **Subject:** | Fw: Return to work clarification |
| **Attachments:** | RTW letter clearance.pdf |

On Wednesday, July 13, 2016 12:31 PM, Sandra Miladinov <mmilad5702@yahoo.com> wrote:

On Friday, July 8, 2016 7:38 AM, Sandra Miladinov <mmilad5702@yahoo.com> wrote:

sorry about that. here you go.

On Thursday, July 7, 2016 9:12 PM, "Colon, Marybel" <Marybel.Colon@nyumc.org> wrote:

Hi Sandra

Can you please resubmit your document as there was no attachment.

Thank you

Marybel

Sent from my iPhone

On Jul 7, 2016, at 8:23 PM, Sandra Miladinov <mmilad5702@yahoo.com> wrote:

> Hi Cheryl,
> I received my clearance to return to work 7/20/2016 today. Please see attached. I
> already uploaded this letter to Aetna disability so please let me know if anything
> additional needs to be done on my part. I appreciate the help from everyone and can't
> wait to get back to work.
> Sandra

On Tuesday, July 5, 2016 1:30 PM, Sandra Miladinov <mmilad5702@yahoo.com> wrote:

> Hi Cheryl,
> Hope you had a great weekend. I never heard back from you about Aetna so I hope it
> was ok. Also just a reminder I have a doctors appt this thursday and will update you
> afterwards. On another note Howard has contacted me about my RTW date and I just

1

informed him that once I see the doctor that I am not sure wether it is my doctors or your (Alan and HR) decision of when I come back. He also informed me that I will have help with patients but no help w any updates on protocols or any changes in protocols for mri. But that two of my coworkers will be there scanning on their own machines. I told him im fine scanning on the machine (GE AND HITACHI I have had no training on the newly installed seimen since I have been out) but my concern was scanning using new protocols or changes to protocols since I havent been there for a while. I have contacted marybel and havent heard back from her today. As much as I am eager to come back to work and I am staying positive, this doesnt sound so great and things can go wrong. Please help.
sandra

Sent from Yahoo Mail on Android


On Mon, Jun 20, 2016 at 12:09 PM, Kurman, Cheryl
<Cheryl.Kurman@nyumc.org> wrote:

Hi Sandra,


We'll be on the lookout for it.  Thanks.

# Cheryl Kurman

Director of Human Resources
Meridian Imaging Group, LLC
516-222-2022 x 1324


---

**From:** Sandra Miladinov [mmilad5702@yahoo.com]
**Sent:** Monday, June 20, 2016 11:47 AM
**To:** Kurman, Cheryl
**Cc:** Marilyn McCarthy
**Subject:** Re: Return to work clarification

Hi Cheryl,
How are you? Hope you had a great weekend. Just contacted Aetna they should be sending over a letter for the employer to fill out. Not sure if it will be you or the FH office. Let me know if you need anything or if you want me to send them anything back.
Sandra


On Friday, June 17, 2016 9:33 AM, "Kurman, Cheryl" <Cheryl.Kurman@nyumc.org> wrote:


Jeanine - per below and prior emails, please advise if we must do anything to extend Sandra's personal LOA date with Trinet, which was originally set to expire today.

# Cheryl Kurman

Director of Human Resources
Meridian Imaging Group, LLC
516-222-2022 x 1324

---

**From:** Sandra Miladinov [mmilad5702@yahoo.com]
**Sent:** Thursday, June 16, 2016 3:50 PM
**To:** Cheryl Kurman; Alan Winakor
**Cc:** 'connie@nextgenerationrad.com'; McCarthy, Marilyn; Colon, Marybel; Kaufman, Howard; 'Jeanine Howard'; Shea, Dawn; Abrokwa, Nana
**Subject:** Re: Return to work clarification

Hi Cheryl,
I was able to move my appointment to July 7th.


On Thursday, June 16, 2016 3:37 PM, Cheryl Kurman <CKurman@nrad.com> wrote:


Sandra, Jeanine Howard, our Trinet rep is already cc'd on this email – but we'll have to know if you can hopefully move up the date of your appointment to know how to address your personal LOA properly.

# Cheryl Kurman

Director of Human Resources
MERIDIAN IMAGING GROUP, LLC
990 Stewart Avenue
Garden City, NY 11530
516-222-2022 x 1324

**From:** Winakor, Alan [mailto:Alan.Winakor@metropolitandiagnostic.com]
**Sent:** Thursday, June 16, 2016 3:35 PM
**To:** Sandra Miladinov <mmilad5702@yahoo.com>
**Cc:** 'connie@nextgenerationrad.com' <connie@nextgenerationrad.com>; Cheryl Kurman <CKurman@nrad.com>; McCarthy, Marilyn <Marilyn.McCarthy@metropolitandiagnostic.com>; 'Colon, Marybel' <Marybel.Colon@nyumc.org>; 'Kaufman, Howard' <Howard.Kaufman2@nyumc.org>; 'Jeanine Howard' <Jeanine.Howard@trinet.com>; Dawn SheaNYU <dawn.shea@nyumc.org>; Abrokwa, Nana <Nana.Abrokwa@nyumc.org>
**Subject:** RE: Return to work clarification

Sandra,
If you can get an appointment sooner, that would be great. If not, then we will wait until your July 12th appointment.
As far as position and shift, those specifics will have to wait until we know your return date, restrictions, if any, etc.
We will address that after we review your new Back to Work info.
We will notify TriNet. Aetna, since that is your personal insurance, you would have to notify directly.
Thanks
Alan

3

**From:** Sandra Miladinov [mailto:mmilad5702@yahoo.com]
**Sent:** Thursday, June 16, 2016 3:16 PM
**To:** Winakor, Alan <Alan.Winakor@metropolitandiagnostic.com>
**Cc:** 'connie@nextgenerationrad.com' <connie@nextgenerationrad.com>; Cheryl Kurman <CKurman@nrad.com>; McCarthy, Marilyn <Marilyn.McCarthy@metropolitandiagnostic.com>; 'Colon, Marybel' <Marybel.Colon@nyumc.org>; 'Kaufman, Howard' <Howard.Kaufman2@nyumc.org>; 'Jeanine Howard' <Jeanine.Howard@trinet.com>; Shea, Dawn <Dawn.Shea@nyumc.org>; Abrokwa, Nana <Nana.Abrokwa@nyumc.org>
**Subject:** Re: Return to work clarification

Alan,
Thank you for replying I was just about to email you. I was really looking forward to coming back tomorrow (had my scrubs ready to go) but understand your decision and do appreciate you working with me. I have a follow up appointment with Dr. Verma July 12.
I do have some questions if someone can help guide me. With this extension how does that effect my shift or position, do I need to contact Aetna or Trinet?, basically what do you need from my end right now?
Sandra


On Thursday, June 16, 2016 2:05 PM, "Winakor, Alan" <Alan.Winakor@metropolitandiagnostic.com> wrote:


Sandra,
Thank you for your patience. We have had a discussion with Dr. Verma's office. We were concerned that your health status letter dated May 26th, 2016 which identified significant work restrictions and the subsequent letter dated June 7th which identified no restrictions. These divergent instructions came with no additional medical evaluation other than the evaluation of May 26th, 2016.
We are concerned with bringing you back to work without a full understanding of your health status and work restrictions. As such, we will not allow you to return to work until after your next physical exam by Dr. Verma. We hope that this examination can be done in short order. If it needs to wait to your next scheduled exam, then we will extend your leave to accommodate that time frame.
In either case, your leave is extended until your next physical exam, that can adequately document your physical progress. Please let us know your next available appointment with Dr. Verma's office.
We hope and trust you will be able to return to work with no, or acceptable limitations relative to your job requirements. We look forward to receiving this documentation.
Thanks
Alan


**From:** Cheryl Kurman [mailto:CKurman@nrad.com]
**Sent:** Wednesday, June 08, 2016 9:00 AM
**To:** 'Sandra Miladinov' <mmilad5702@yahoo.com>; McCarthy, Marilyn <Marilyn.McCarthy@metropolitandiagnostic.com>; 'Colon, Marybel' <Marybel.Colon@nyumc.org>; Winakor, Alan <Alan.Winakor@metropolitandiagnostic.com>; 'Jeanine Howard' <Jeanine.Howard@trinet.com>; 'Kaufman, Howard' <Howard.Kaufman2@nyumc.org>

**Cc:** 'connie@nextgenerationrad.com' <connie@nextgenerationrad.com>
**Subject:** RE: Return to work clarification
**Importance:** High

Sandra,

Good morning.

I am sending this email to let you know that I was premature in sending the email approving your return.

The information you have provided to us must be reviewed by our executive team as well as by our attorneys. We will follow up with you as soon as a determination is made.

Cheryl Kurman

Director of Human Resources
MERIDIAN IMAGING GROUP, LLC
990 Stewart Avenue
Garden City, NY 11530
516-222-2022 x 1324

-----------------------------------------------------------
This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain information that is proprietary, confidential, and exempt from disclosure under applicable law. Any unauthorized review, use, disclosure, or distribution is prohibited. If you have received this email in error please notify the sender by return email and delete the original message. Please note, the recipient should check this email and any attachments for the presence of viruses. The organization accepts no liability for any damage caused by any virus transmitted by this email.
================================

-----------------------------------------------------------
This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain information that is proprietary, confidential, and exempt from disclosure under applicable law. Any unauthorized review, use, disclosure, or distribution is prohibited. If you have received this email in error please notify the sender by return email and delete the original message. Please note, the recipient should check this email and any attachments for the presence of viruses. The organization accepts no liability for any damage caused by any virus transmitted by this email.
================================

---------------------------------------------------------------
This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain information that is proprietary, confidential, and exempt from disclosure under applicable law. Any unauthorized review, use, disclosure, or distribution is prohibited. If you have received this email in error please notify the sender by return email and delete the original message. Please note, the recipient should check this email and any attachments for the presence of viruses. The organization accepts no liability for any damage caused by any virus transmitted by this email.
==================================

# Exhibit P

**Jackson, Matthew**

| | |
|---|---|
| **From:** | Sandra Miladinov <mmilad5702@yahoo.com> |
| **Sent:** | Wednesday, July 13, 2016 12:36 PM |
| **To:** | Ceilidh B. Gao |
| **Subject:** | Fw: Follow up |

On Wednesday, July 13, 2016 10:55 AM, Sandra Miladinov <mmilad5702@yahoo.com> wrote:

Cheryl,
I am surprised and confused at this development. I definitely need some clarification since my leave was extended by Alan and my return depended on my return to work clearance from my surgeon. The attached letter was sent the day of my appt 7/7/2016. At no point was i contacted until yesterday since 7/7/2016. Why and what was this decision based on?
Sandra

On Tuesday, July 12, 2016 9:43 AM, Cheryl Kurman <CKurman@nrad.com> wrote:

Sandra,

This email is to advise you that, as you have exhausted both your FMLA and extended LOA, your employment with both Meridian and Trinet is being terminated as of today.  We invite you to apply in the future for open positions within the company.

Marilyn McCarthy will send you any applicable termination paperwork.

Yours truly,

Cheryl Kurman

Director of Human Resources
MERIDIAN IMAGING GROUP, LLC
990 Stewart Avenue
Garden City, NY 11530
516-222-2022 x 1324

# Exhibit Q

FORM NLRB-760
(7-10)

**UNITED STATES OF AMERICA**
**NATIONAL LABOR RELATIONS BOARD**

| | | |
|---|---|---|
| | Case No. 29-RC-174122 | Date Filed Apr 15, 2016 |
| | Date Issued May 6, 2016 | |

MERIDIAN IMAGING GROUP, LLC

**Employer**

and

1199 SEIU UNITED HEALTHCARE WORKERS EAST

**Petitioner**

City Forest Hills        State NY

**Type of Election:**
(Check one:)

☒ Stipulation
☐ Board Direction
☐ Consent Agreement
☐ RD Direction
   Incumbent Union (Code)

*(If applicable check either or both:)*
☐ 8(b) (7)
☐ Mail Ballot

# TALLY OF BALLOTS    VOTING GROUP – UNIT A

The undersigned agent of the Regional Director certifies that the results of tabulation of ballots case in the election held in the above case, and concluded on the date indicated above, were as follows:

1. Approximate number of eligible voters ............................................... **29**

2. Number of Void ballots ...............................................

3. Number of Votes cast for **inclusion with nonprofessional employees in a unit for the purposes of collective bargaining** ......... **23**

4. Number of Votes cast for **exclusion from nonprofessional employees in a unit for the purposes of collective bargaining** ......... **2**

5. Number of Votes cast for ...............................................

6. Number of Votes cast against participating labor organization(s) ...............................................

7. Number of Valid votes counted (sum 3, 4, 5, and 6) ............................................... **25**

8. Number of challenged ballots ............................................... **6**

9. Number of Valid votes counted plus challenged ballots (sum of 7 and 8) ............................................... **31**

10. Challenges are (not) sufficient in number to affect the results of the election.

11. A majority of the valid votes counted plus challenged ballots (Item 9 has not) been cast for *INCLUSION WITH NONPROFESSIONALS*

For the Regional Director

The undersigned acted as authorized observers in the counting and tabulating of ballots indicated above. We hereby certify that the counting and tabulating were fairly and accurately done, that the secrecy of the ballots was maintained, and that the results were as indicated above. We also acknowledge service of this tally.

**For** EMPLOYER

**For** PETITIONER

**For**

FORM NLRB-760
(7-10)

UNITED STATES OF AMERICA
**NATIONAL LABOR RELATIONS BOARD**

Date Filed

Case No. 29-RC-174122          Apr 15, 2016

Date Issued May 6, 2016

City Forest Hills                          State NY

| Type of Election: (Check one:) | (If applicable check either or both:) |
|---|---|

MERIDIAN IMAGING GROUP, LLC

Employer

and

1199 SEIU UNITED HEALTHCARE WORKERS EAST

Petitioner

☒ Stipulation                    ☐ 8(b) (7)

☐ Board Direction                ☐ Mail Ballot

☐ Consent Agreement

☐ RD Direction
Incumbent Union (Code)

# TALLY OF BALLOTS

VOTING GROUP - UNIT A AND
VOTING GROUP - UNIT B

The undersigned agent of the Regional Director certifies that the results of tabulation of ballots case in the election held in the above case, and concluded on the date indicated above, were as follows:

1. Approximate number of eligible voters — **56**

2. Number of Void ballots — 

3. Number of Votes cast for **PETITIONER** — **42**

4. Number of Votes cast for — 

5. Number of Votes cast for — 

6. Number of Votes cast against participating labor organization(s) — **5**

7. Number of Valid votes counted (sum 3, 4, 5, and 6) — **47**

8. Number of challenged ballots — **6**

9. Number of Valid votes counted plus challenged ballots (sum of 7 and 8) — **53**

10. Challenges are (not) sufficient in number to affect the results of the election.

11. A majority of the valid votes counted plus challenged ballots (Item 9) has (not) been cast for **1199 SEIU**

For the Regional Director

The undersigned acted as authorized observers in the counting and tabulating of ballots indicated above. We hereby certify that the counting and tabulating were fairly and accurately done, that the secrecy of the ballots was maintained, and that the results were as indicated above. We also acknowledge service of this tally.

For **EMPLOYER**

For **PETITIONER**

For

# Exhibit R

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 29

Meridian Imaging Group, LLC

             **Employer**

   **and**                                Case 29-RC-174122

1199SEIU United Healthcare Workers East

             **Petitioner**

**TYPE OF ELECTION:** STIPULATED

### CERTIFICATION OF REPRESENTATIVE

An election has been conducted under the Board's Rules and Regulations. The Tally of Ballots shows that a collective-bargaining representative has been selected. No timely objections have been filed.

As authorized by the National Labor Relations Board, it is certified that a majority of the valid ballots has been cast for

      1199SEIU United Healthcare Workers East

and that it is the exclusive collective-bargaining representative of the employees in the following appropriate unit:

**Unit:** Included: All regular full-time, part-time and per diem registered nurses, ultra sound technologists, MRI technologists, X-ray technologists, mammogram technologists, radiologic technologists, and CAT scan technologists, schedulers, front desk, medical receptionists, breast coordinators, maintenance, medical records, and liaisons, employed by the Employer at the Employer's Forest Hills facility. Excluded: All supervisors and guards as defined by the Act.

May 20, 2016

*James M. Paulsen*
JAMES G. PAULSEN
Regional Director, Region 29
National Labor Relations Board

Attachment: Notice of Bargaining Obligation

## NOTICE OF BARGAINING OBLIGATION

In the recent representation election, a labor organization received a majority of the valid votes cast. Except in unusual circumstances, unless the results of the election are subsequently set aside in a post-election proceeding, the employer's legal obligation to refrain from unilaterally changing bargaining unit employees' terms and conditions of employment begins on the date of the election.

The employer is not precluded from changing bargaining unit employees' terms and conditions during the pendency of post-election proceedings, **as long as** the employer (a) gives sufficient notice to the labor organization concerning the proposed change(s); (b) negotiates in good faith with the labor organization, upon request; and (c) good faith bargaining between the employer and the labor organization leads to agreement or overall lawful impasse.

This is so even if the employer, or some other party, files objections to the election pursuant to Section 102.69 of the Rules and Regulations of the National Labor Relations Board (the Board). If the objections are later overruled and the labor organization is certified as the employees' collective-bargaining representative, the employer's obligation to refrain from making unilateral changes to bargaining unit employees' terms and conditions of employment begins on the date of the election, not on the date of the subsequent decision by the Board or court. Specifically, the Board has held that, absent exceptional circumstances,[1] an employer acts at its peril in making changes in wages, hours, or other terms and conditions of employment during the period while objections are pending and the final determination about certification of the labor organization has not yet been made.

It is important that all parties be aware of the potential liabilities if the employer unilaterally alters bargaining unit employees' terms and conditions of employment during the pendency of post-election proceedings. Thus, typically, if an employer makes post-election changes in employees' wages, hours, or other terms and conditions of employment without notice to or consultation with the labor organization that is ultimately certified as the employees' collective-bargaining representative, it violates Section 8(a)(1) and (5) of the National Labor Relations Act since such changes have the effect of undermining the labor organization's status as the statutory representative of the employees. This is so even if the changes were motivated by sound business considerations and not for the purpose of undermining the labor organization. As a remedy, the employer could be required to: 1) restore the status quo ante; 2) bargain, upon request, with the labor organization with respect to these changes; and 3) compensate employees, with interest, for monetary losses resulting from the unilateral implementation of these changes, until the employer bargains in good faith with the labor organization, upon request, or bargains to overall lawful impasse.

---

[1] Exceptions may include the presence of a longstanding past practice, discrete event, or exigent economic circumstance requiring an immediate response.